1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  ANYA M. BINSACCA
   Supervising Deputy Attorney General
5  AMBER N. WIPFLER, State Bar No. 238484
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5721
    Fax:  (415) 703-5843
8   Email:  Amber.Wipfler@doj.ca.gov

9  Attorneys for Respondent Warden B. Curry

10

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                    SAN FRANCISCO DIVISION

14

15  **Alex Jackson,**                          08-0923 MMC

16                          Petitioner,    **ANSWER TO THE ORDER TO SHOW
                                           CAUSE; MEMORANDUM OF POINTS
                                           AND AUTHORITIES**
17              v.
                                           Judge:  The Honorable Maxine M. Chesney
18  **Ben Curry, Warden,**

19                          Respondent.

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2                                                                                                          **Page**

3  INTRODUCTION                                                                                          1

4  ANSWER TO THE ORDER TO SHOW CAUSE                                                     2

5  MEMORANDUM OF POINTS AND AUTHORITIES                                          6

6  ARGUMENT                                                                                                6

7         THE STATE COURTS' DENIALS OF PETITIONER'S HABEAS
          CLAIMS WERE NOT CONTRARY TO OR AN UNREASONABLE
8         APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW,
          NOR BASED ON AN UNREASONABLE DETERMINATION OF
9         THE FACTS.                                                                                      6

10               A.    The State Court Decisions Were Not Contrary to or an Unreasonable
                       Interpretation of Clearly Established Supreme Court Law.                  7
11
                       1.    Petitioner received all process due under the only United States
12                           Supreme Court law addressing due process in the context of parole
                             suitability.                                                                   7
13
                       2.    The Ninth Circuit's some-evidence test is not clearly established
14                           Supreme Court law.                                                          8

15                     3.    Even if the some-evidence standard was clearly established federal
                             law in the parole context, the standard was correctly applied by the
16                           state courts.                                                                 10

17                     4.    The Board may rely on static factors to deny parole.                 11

18                     5.    Petitioner provides no evidence that his sentence has been
                             converted to life without the possibility of parole.                  13
19
                 B.    The State Court Decisions Upholding the Board's Parole Denial Were
20                     Based on a Reasonable Interpretation of the Facts.                        13

21  CONCLUSION                                                                                           13

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2                                                                    Page

3   **Cases**

4   *Bd. of Pardons v. Allen*
    482 U.S. 369 (1987                                                4
5

6   *Biggs v. Terhune*
    334 F.3d 910 (9th Cir. 2003)                                     12

7   *Carey v. Musladin*
    ___ U.S. ___, 127 S. Ct. 649 (2006)                          5, 8, 9
8

9   *Crater v. Galaza*
    491 F.3d 119 (9th Cir. 2007)                                      8

10  *Foote v. Del Papa*
    492 F.3d 1026 (9th Cir. 2007)                                  8, 12
11

12  *Gagnon v. Scarpelli*
    411 U.S. 778 (1973)                                               9

13  *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*
    442 U.S. 1 (1979)                                      4, 5, 7, passim
14

15  *Hayward v. Marshall*
    512 F.3d 536 (2008) (pet'n. for rehr'g. pending)                 12

16  *In re Dannenberg*
    34 Cal. 4th 1061 (2005)                                           4
17

18  *In re Lawrence*
    150 Cal. App. 4th 1511 (2007)                                    11

19  *Irons v. Carey*
    505 F.3d 846 (2007)                                               8
20

21  *Johnson v. Zerbst*
    304 U.S. 458 (1938)                                           6, 13

22  *Juan H. v. Allen*
    408 F.3d 1262 (9th Cir. 2005)                                    13
23

24  *Kane v. Garcia Espitia*
    546 U.S. 9 (2005)                                             8, 12

25  *Maynard v. Cartwright*
    486 U.S. 356 (1998)                                               7
26

27  *Miller-El v. Cockrell*
    573 U.S. 322 (2003)                                              10

28

**TABLE OF AUTHORITIES** (continued)

Page

*Morrissey v. Brewer*
408 U.S. 471 (1972)                                                                9

*Nguyen v. Garcia*
477 F.3d 716 (9th Cir. 2007)                                                    8, 12

*Plumlee v. Masto*
___ F.3d ___, 2008 WL 151273 (9th Cir. 2008)                          7, 9, 12

*Sandin v. Connor*
515 U.S. 472 (1995)                                                                4

*Sass v. California Board of Prison Terms*
461 F.3d 1123 (9th Cir. 2006)                                              4, 6, 12

*Stenson v. Lambert*
504 F.3d 873 (9th Cir. 2007)                                                  8, 12

*Superintendent v. Hill*
472 U.S. 445 (1985)                                                                5

*Van Patten*
___ U.S. ___, 128 S. Ct at 746                                                    8

*Wilkinson v. Austin*
545 U.S. 2384 (2005)                                                              7

*Williams (Terry) v. Taylor*
529 U.S. 362 (2000)                                                              7

*Wolff v. McDonnell*
418 U.S. 539 (1974)                                                              9

*Wright v. Van Patten*
___ U.S. ___, 128 S. Ct. 743 (2008)                                          5

*Ylst v. Nunnemaker*
501 U.S. 797 (1991)                                                              6


**Regulations**

California Code of Regulations, Title 15
        § 2402                                                                    11
        § 2402(c)(1)                                                              6

## TABLE OF AUTHORITIES  (continued)

| | Page |
|---|---|
| **Statutes** | |
| 28 United States Code | |
| § 2244(d)(1) | 6 |
| § 2254(d)(2) | 13 |
| § 2254(e)(1) | 13 |
| California Penal Code | |
| § 3041(b) | 5 |
| | |
| **Other Authorities** | |
| | |
| Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) | 4-10, passim |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  ANYA M. BINSACCA
   Supervising Deputy Attorney General
5  AMBER N. WIPFLER, State Bar No. 238484
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5721
     Fax:  (415) 703-5843
8    Email:  Amber.Wipfler@doj.ca.gov

9  Attorneys for Respondent Warden B. Curry

10

11                 IN THE UNITED STATES DISTRICT COURT

12              FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                       SAN FRANCISCO DIVISION

14

15  **Alex Jackson,**                          08-0923 MMC

16                              Petitioner,    **ANSWER TO THE ORDER TO SHOW
                                               CAUSE; MEMORANDUM OF POINTS
                                               AND AUTHORITIES**
17                    v.

18  **Ben Curry, Warden,**                     Judge:  The Honorable Maxine M. Chesney

19                              Respondent.

20

21                            __INTRODUCTION__

22       In a petition for writ of habeas corpus, Petitioner Alex Jackson alleges that the Board of

23  Parole Hearings unconstitutionally denied him parole at his 2005 parole suitability hearing.

24  Petitioner, who is currently serving an indeterminate life sentence for first degree murder, claims

25  that the Board based its decision on insufficient evidence, failed to consider his personal

26  culpability in the commitment offense, and has converted his sentence to life without the

27  possibility of parole.  This Court issued an order to show cause on February 27, 2008.

28  Respondent Ben Curry, Warden of the Correctional Training Facility, answers as follows:

Answer to OSC; Mem. of P. & A.                                    *Jackson v. Curry*
                                                                  08-0923 MMC

## ANSWER TO THE ORDER TO SHOW CAUSE

In response to the petition for writ of habeas corpus filed on February 13, 2008, Respondent admits, denies, and alleges the following:

1.     Petitioner is in the lawful custody of the California Department of Corrections and Rehabilitation pursuant to his 1983 convictions of first degree murder, kidnap, and robbery. (Pet. Ex. B, Abstracts of Judgment.) He is currently serving an indeterminate sentence of twenty-seven-years-to-life. (*Id.* at 1.) Petitioner does not challenge his underlying conviction in the current proceeding.

2.     Respondent affirmatively alleges that during the early morning hours of November 24, 1981, Petitioner, a cocaine dealer, and his co-defendant Gray committed a premeditated robbery of an apartment. (Pet. Ex. A, 2005 Parole Hearing Transcript at 12.) After gaining entry into the apartment, Petitioner, who was armed with a .32 caliber handgun, forced the occupants into the bedroom and ordered them to lie on the floor. (*Id.*) Gray then began shooting at the occupants as they lay on the floor. (*Id.*) One victim was shot in the hand and buttocks, another in the hand and shoulder, and another in the face. (*Id.* at 12-13.) Victim Clarence Fletcher was shot in the chest and arms, and died at the scene. (*Id.* at 13.) Only one of the apartment's occupants managed to avoid injury. (*Id.*) Petitioner then stole some drugs and money from one of the victim's purses, and he and Gray fled the premises. (*Id.* at 14.) They later split the money and drugs between themselves. (*Id.* at 13.)

3.     Respondent affirmatively alleges that Petitioner has an extensive criminal history dating back to 1970, when he was thirteen years old, and that this criminal conduct was continuous until his arrest for the commitment offense. (Pet. Ex. A at 16.) As a juvenile, he was arrested twenty-one times for offenses such as larceny, theft, grand theft auto, and burglary. (*Id.* at 16-19.) At age seventeen, Petitioner had a sustained petition for crimes against a child, after he choked a thirteen year-old girl and forced her to have sex with him. (*Id.* at 19.) As an adult, Petitioner was convicted of theft, felony escape, and robbery, and received multiple jail and state prison sentences. (*Id.* at 19-20.) Petitioner also admitted that he was a cocaine dealer at the time of his commitment offense. (*Id.* at 13, 29.)

Answer to OSC; Mem. of P. & A.

4.    Respondent affirmatively alleges that Petitioner has a history of marijuana and cocaine abuse, although at his 2005 parole hearing, he initially denied having any history of using drugs. (Pet. Ex. A at 29.)  Upon further questioning from the panel, he admitted to marijuana use, and when presented with conflicting statements from his psychological evaluations, admitted to cocaine use as well. (*Id.* at 29, 65-67.)

5.    Respondent affirmatively alleges that during his incarceration, Petitioner has been found guilty of four serious rule violations, most recently in 2000 for fraudulent use of another inmate's privilege card. (Pet. Ex. C at 5.)

6.    Respondent admits that on December 14, 2005, Petitioner received a subsequent parole consideration hearing. (Pet. Ex. A.)  At that time, he had served twenty-two years of his twenty-seven-year-to-life sentence. (*Id.* at 1.)  After considering all relevant and reliable information before it, the Board determined that Petitioner would pose an unreasonable risk of danger to society if released from prison, and denied parole. (*Id.* at 83.)  The Board based its decision on the nature of the commitment offense, Petitioner's criminal history, his in-prison disciplinary violations, and his lack of insight into the crime. (*Id.* at 83-92.)  Specifically, the Board found that the commitment offense involved multiple victims, was carried out in a dispassionate and calculated manner, demonstrated an exceptionally callous disregard for human suffering, and was committed for an extremely trivial motive. (*Id.* at 83-84.)  The Board also found that Petitioner had a lengthy criminal history and had failed to profit from society's previous attempts to correct his criminality. (*Id.* at 84-85.)  The Board was also concerned about Petitioner's attitude toward the crime, as he appeared to use poverty as a justification for his criminal behavior, and noted that he had only been disciplinary-free for five years. (*Id.* at 89-90.)  Finally, as required by law, the Board cited the opposition of the District Attorney of Los Angeles County. (*Id.* at 89.)  The Board commended Petitioner for his educational achievements, satisfactory work history, and solid housing plans, but determined that the positive aspects of his behavior did not yet outweigh the factors showing unsuitability for release, and denied parole for three years. (*Id.* at 90.)

7.    Respondent admits that on April 16, 2007, the Los Angeles County Superior denied Petitioner's habeas petition, in which he alleged the same general causes of action as in the

Answer to OSC; Mem. of P. & A.

*Jackson v. Curry*
08-0923 MMC

3

1  current petition. (Ex. A, Superior Court Petition and Denial.) The court determined that the

2  Board's decision was supported by some evidence, including the nature of the offense and

3  Petitioner's criminal history. (*Id.* at 2.)

4        8.   Respondent admits that on June 28, 2007, the California Court of Appeal denied

5  Petitioner's petition for writ of habeas corpus, in which he alleged the same general causes of

6  action as in the current petition. (Ex. B, Appellate Court Petition and Denial.) The court held

7  that "[t]here is some evidence to support the decision of the Board of Parole Hearings." (*Id.* at

8  1.)

9        9.   Respondent admits that on September 12, 2007 the California Supreme Court

10  summarily denied Petitioner's request for review, in which he alleged the same general causes of

11  action as in the current petition. (Ex. C, Supreme Court Petition and Denial.) Thus, Respondent

12  admits that Petitioner has exhausted his state court remedies as to the claims raised in the current

13  petition. Respondent denies that Petitioner has exhausted his claims to the extent that they are

14  more broadly interpreted to encompass any systematic issues beyond the review of his 2006

15  parole reversal.

16       10.  Respondent denies that Petitioner has a federally protected liberty interest in parole;

17  hence, Petitioner fails to assert a basis for federal jurisdiction. *Greenholtz v. Inmates of Neb.*

18  *Penal & Corr. Complex*, 442 U.S. 1 (1979); *Bd. of Pardons v. Allen*, 482 U.S. 369, 374 (1987)

19  (no federal liberty interest without an expectation of early release); *In re Dannenberg*, 34 Cal. 4th

20  1061, 1087 (no expectation of early release in California); *Sandin v. Connor*, 515 U.S. 472, 484

21  (1995) (due process limited to freedom from restraint which imposes "atypical and significant

22  hardship on inmates in relation to ordinary incidents of prison life.") Respondent acknowledges

23  that the Ninth Circuit came to the opposite conclusion in *Sass v. California Board of Prison*

24  *Terms*, 461 F.3d 1123 (9th Cir. 2006), but preserves the argument.

25       11.  Respondent denies that the state court denials of habeas corpus relief were contrary to,

26  or involved an unreasonable application of, clearly established United States Supreme Court law,

27  or that the denials were based on an unreasonable interpretation of facts in light of the evidence

28  presented. Petitioner therefore fails to make a case for relief under the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA).

12.   Respondent affirmatively alleges that Petitioner had an opportunity to present his case, and that the Board provided him with a detailed explanation as to why he was denied parole. Thus, Petitioner received all process due under *Greenholtz,* the only clearly established Supreme Court law regarding the due process rights of inmates at parole consideration hearings.

13.   Respondent affirmatively alleges that the Board conducted an individualized assessment of Petitioner's parole suitability and considered all relevant and reliable evidence before it.

14.   Respondent denies that this Court must review Petitioner's parole denial under the some-evidence standard.  In *Carey v. Musladin*, ___ U.S. ___, 127 S. Ct. 649, 653 (2006) and *Wright v. Van Patten*, ___ U.S. ___, 128 S. Ct. 743, 747 (2008) the United States Supreme Court emphasized that under AEDPA, only Supreme Court holdings regarding the specific issue presented may be used to overturn valid state court decisions.  As no clearly established Supreme Court law provides that a parole denial must be supported by some evidence, this Court need not review the current matter under the some-evidence standard.

15.   Respondent affirmatively alleges that if the some-evidence standard does apply to the review of parole denials, the proper standard is that found in *Superintendent v. Hill*, 472 U.S. 445, 455 (1985), which requires that only a "modicum of evidence" support the decision to deny parole.  Respondent affirmatively alleges that under this standard, some evidence supports the Board's parole denial.

16.   Respondent denies that this Court must make an independent determination of whether Petitioner currently poses an unreasonable risk of danger to society in order to uphold the state court decisions denying parole.

17.   Respondent denies that the Board relied solely on immutable factors to deny parole, as the decision was based in part on Petitioner's failure to remain disciplinary free and his lack of insight into the commitment offense.  (Pet. Ex. A at 89-90.)

18.   Respondent affirmatively alleges that the Board properly considered the gravity of Petitioner's commitment offense, as required under California Penal Code section 3041(b) and

1   California Code of Regulations title 15, sections 2402(b), (c)(1)-(2).  Respondent further

2   affirmatively alleges that federal due process does not preclude the Board from relying on static

3   factors to deny parole.  *Sass*, 461 F.3d at 1129.

4       · 19.  Respondent denies that Petitioner's numerous cites to state appellate cases are relevant

5   to evaluating a federal due process claim under AEDPA.

6       · 20.  Respondent denies that the Board's 2005 parole denial has converted Petitioner's

7   sentence to life without the possibility of parole.

8       21.  Respondent denies that the Board violated Petitioner's due process rights by denying

9   parole in 2005.

10      22.  Respondent admits that Petitioner's claims are timely under 28 U.S.C. § 2244(d)(1),

11  and that the petition is not barred by the non-retroactivity doctrine.

12      23.  Respondent denies that an evidentiary hearing is necessary in this matter.

13      24.  Respondent affirmatively alleges that Petitioner fails to state or establish any grounds

14  for habeas corpus relief.

15      25.  Except as expressly admitted above, Respondent denies, generally and specifically,

16  each allegation of the petition, and specifically denies that Petitioner's administrative, statutory,

17  or constitutional rights have been violated in any way.

18      Accordingly, Respondent respectfully requests that the petition for writ of habeas corpus be

19  denied.

### MEMORANDUM OF POINTS AND AUTHORITIES

### ARGUMENT

**THE STATE COURTS' DENIALS OF PETITIONER'S HABEAS
CLAIMS WERE NOT CONTRARY TO OR AN UNREASONABLE
APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW,
NOR BASED ON AN UNREASONABLE DETERMINATION OF
THE FACTS.**

25      When, as here, the California Supreme Court denies a petition for review without comment,

26  the federal court must look to the last reasoned decision as the basis for the state court's

27  judgment.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-804 (1991).  Here, the last reasoned decision

28  is the state appellate court's June 28, 2007 judgment that some evidence supported the Board's

Answer to OSC; Mem. of P. & A.                                          *Jackson v. Curry*
                                                                       08-0923 MMC

1  parole denial.  (Ex. B.)  Because nothing in the record indicates that this decision was either

2  contrary to, or an unreasonable application of, clearly established federal law, or based on an

3  unreasonable interpretation of the facts, the provisions of AEDPA mandate that Petitioner's

4  claim for habeas relief be denied.  28 U.S.C. §2254(d)(1-2).

5  **A.   The State Court Decisions Were Not Contrary to or an Unreasonable
       Interpretation of Clearly Established Supreme Court Law.**

6

7  The first standard of AEDPA is that a state court habeas decision may not be overturned

8  unless it is contrary to, or an unreasonable interpretation of, clearly established federal law.

9  "Clearly established federal law" refers to "the holdings, as opposed to the dicta, of [the United

10  States Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*

11  *(Terry) v. Taylor*, 529 U.S. 362, 412 (2000).  As such, for purposes of AEDPA, "[w]hat matters

12  are the holdings of the Supreme Court, not the holdings of lower federal courts." *Plumlee v.*

13  *Masto*, ___ F.3d ___, 2008 WL 151273 at *6 (9th Cir. 2008) (attached as Ex. G).  Petitioner,

14  however, asks this Court to overturn three valid state court decisions based on state appellate

15  court holdings and Ninth Circuit dicta.  Because AEDPA does not permit such a result, and

16  because the state court decisions denying Petitioner relief did not violate clearly established

17  Supreme Court law, the petition must be denied.

18  **1.   Petitioner received all process due under the only United States Supreme
        Court law addressing due process in the context of parole suitability.**

19

20  It is undisputed that *Greenholtz*, 442 U.S. 1, is the only Supreme Court decision addressing

21  due process in the specific context of parole consideration hearings.  *Greenholtz* specifically

22  rejected the idea that the parole authority must specify particular evidence to support its decision,

23  and held that the only process due an inmate at a parole consideration is first, an opportunity to

24  be heard, and second, if parole is denied, an explanation for the denial.  *Id.* at 16.  Thus, as a

25  matter of clearly established Supreme Court law, a challenge to a parole decision will fail if the

26  inmate has received the protections required under *Greenholtz*.  *See Maynard v. Cartwright*, 486

27  U.S. 356, 361-62 (1998); *Wilkinson v. Austin*, 545 U.S. 2384, 2397 (2005).  Because Petitioner

28  received both of these protections, and does not argue otherwise, he received all process due

Answer to OSC; Mem. of P. & A.                                      *Jackson v. Curry*
                                                                    08-0923 MMC

1   under clearly established Supreme Court law.  Accordingly, the state court decision upholding

2   the Board's parole denial is not contrary to clearly established federal law, and Petitioner is not

3   entitled to habeas relief.

4        **2.**   **The Ninth Circuit's some-evidence test is not clearly established Supreme Court**
           **law.**

5

6        Petitioner asks this Court to follow the Ninth Circuit's erroneous holding that clearly

7   established federal law requires a parole decision to be supported by some evidence.  *Irons v.*

8   *Carey*, 505 F.3d 846, 850-51 (2007).  This standard stems from the decision in *Superintendent v.*

9   *Hill*, 472 U.S. 445, 455-56, which provides that some evidence must support the decision of a

10   prison disciplinary board to revoke good-time credits.  In *Irons*, the Ninth Circuit took the some-

11   evidence standard from the prison disciplinary context, applied it to the parole consideration

12   context, and deemed this new application "clearly established Supreme Court law" for the

13   purposes of AEDPA.

14        In the last two years, the Supreme Court has made it clear that circuit courts may not import

15   a federal standard used for one set of circumstances into an entirely different set of circumstances

16   under the guise of "clearly established federal law."  In *Musladin*, the Supreme Court overturned

17   the Ninth Circuit's determination that a prejudice test regarding one type of case could was the

18   clearly established standard of review used for a similar but factually distinct case.  In doing so,

19   the *Musladin* court held that clearly established federal law refers only to the holdings of the

20   Supreme Court on the specific issue presented.  *Musladin*, ___ U.S. ___, 127 S. Ct. at 653.

21   Similarly, in *Van Patten*, the Supreme Court held that under AEDPA standards, an attorney's

22   telephonic court appearance could not constitute ineffective assistance of counsel because the

23   Court had never addressed the specific issue of appearance via speakerphone.  *Van Patten*, ___

24   U.S. ___, 128 S. Ct at 746-47; *see also Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005) (prisoner

25   denied access to law library has no relief under AEDPA absent a Supreme Court decision

26   addressing that issue).  The Ninth Circuit has affirmed this principle in *Nguyen v. Garcia*, 477

27   F.3d 716, 718, 727 (9th Cir. 2007), *Crater v. Galaza*, 491 F.3d 119, 1126, n. 8 (9th Cir. 2007),

28   *Foote v. Del Papa*, 492 F.3d 1026, 1029-30 (9th Cir. 2007), *Stenson v. Lambert*, 504 F.3d 873,

Answer to OSC; Mem. of P. & A.

1  881 (9th Cir. 2007); and *Plumlee*, ___ F.3d ___, 2008 WL 151273 at *6, all of which

2  acknowledge that decisions by courts other than the Supreme Court are non-dispositive under

3  AEDPA standards.

4        Contrary to the holding in *Irons*, a prison disciplinary hearing and a parole consideration

5  hearing are not identical, and thus not subject to the same level of judicial review. Although both

6  hearings can affect the duration of an inmate's confinement, only prison disciplinary hearings

7  involve a finding of guilt; consequently, the process due in disciplinary hearings is greater than

8  that required in parole hearings. *Greenholtz*, 442 U.S. at 15-16. In fact, the *Greenholtz* court

9  specifically distinguished a parole consideration hearing from a prison disciplinary hearing,

10 stating that "[p]rocedures designed to elicit specific facts, such as those required in *Morrissey*,

11 *Gagnon*, and *Wolff* are not necessarily appropriate" in a parole suitability determination.[1] *Id.* at

12 14. While disciplinary hearings are adversarial proceedings, "the parole-release decision . . . is

13 more subtle and depends on an amalgam of elements, some of which are factual but many of

14 which are purely subjective appraisals by the Board members based upon their experience with

15 the difficult and sensitive task of evaluating the advisability of parole release." *Id.* at 9-10. Thus,

16 unlike a prison disciplinary hearing, in a parole consideration hearing "there is no set of facts

17 which, if shown, mandate a decision favorable to the individual." *Id.* at 10. It follows that the

18 two types of hearing are not the same, and a Supreme Court decision applicable to one does not

19 apply to the other. *Musladin*, ___ U.S. ___, 127 S. Ct. at 653. As such, Petitioner is entitled

20 only to the due process protections outlined in *Greenholtz*, and this Court need not review the

21 basis of the Board's decision under the some-evidence standard.

22       Any argument that due process requires a more stringent standard of review than that

23 provided in *Greenholtz* is without merit. The California courts have already evaluated the

24 substantive merits of Petitioner's claims. The absence of further evidentiary review does not

25

26     1. *See Morrissey v. Brewer*, 408 U.S. 471 (1972) (establishing process due in parole

27 revocation hearings); *Gagnon v. Scarpelli*, 411 U.S. 778 (1973) (establishing process due in probation revocation hearings) ; *Wolff v. McDonnell*, 418 U.S. 539 (1974) (establishing process

28 in prison disciplinary hearings).

1  diminish Petitioner's due process rights; rather, it merely defers to the state courts' evaluation of

2  those rights, consistent with AEDPA's stated purpose of "further[ing] comity, finality, and

3  federalism." *Miller-El v. Cockrell*, 573 U.S. 322, 337 (2003).

4          Thus, Petitioner is entitled to only the protections provided in *Greenholtz*, the only clearly

5  established federal law describing the process due at a parole consideration hearing.  Because he

6  received these protections, the state court decisions upholding his the Board's parole denial are

7  not contrary to clearly established federal law.

8          **3.     Even if the some-evidence standard was clearly established federal law in the
            parole context, the standard was correctly applied by the state courts.**
9

10         Even if the some-evidence standard was clearly established federal law in the parole

11  context for the purposes of AEDPA, Petitioner's claim would nonetheless fail because the state

12  courts correctly applied the standard to deny habeas relief.  The some-evidence standard "does

13  not require examination of the entire record, independent assessment of the credibility of

14  witnesses, or weighing of the evidence;" rather, it is satisfied if there is "*any* evidence in the

15  record that could support the conclusion made by the [initial decision-maker]."  *Hill*, 472 U.S. at

16  455-57 (emphasis added); *see also Sass*, 461 F.3d at 1129 ("*Hill's* some evidence standard is

17  minimal").

18         The facts of *Hill* demonstrate how little evidence is required to satisfy the some-evidence

19  standard.  In *Hill*, three inmates were seen jogging in the opposite direction of an inmate who had

20  been injured.  472 U.S. at 448.  There were no eyewitnesses to the attack and the injured inmate

21  swore that the other three had not caused his injures, but the prison disciplinary board

22  nonetheless found the three inmates guilty of assault.  *Id.* at 447-48.  The Supreme Court

23  affirmed that some evidence supported the guilty finding, stating that "[a]lthough the evidence in

24  this case might be characterized as meager, and there was no direct evidence identifying any one

25  of three inmates as the assailant, the record is not so devoid of evidence that the findings of the

26  disciplinary board were without support or otherwise arbitrary."  *Id.* at 457.  Thus, *Hill*

27  demonstrates that the some-evidence standard is very minimal, and will be satisfied with only a

28  "modicum of evidence."  *Id.* at 450.

Answer to OSC; Mem. of P. & A.                                           *Jackson v. Curry*
                                                                        08-0923 MMC

Here, there is at least a "modicum of evidence" to support the Board's findings that Petitioner's commitment offense was especially heinous, that he had an extensive criminal history, that he failed to remain disciplinary-free, and that he lacked insight into the nature of his commitment offense. As each of these factors tends to indicate parole unsuitability under California law, the state courts correctly denied Petitioner's claims. *See* Cal. Code Regs. tit. 15, § 2402.

Petitioner claims that the Board's denial may not be based on the fact that he demonstrates multiple regulatory factors tending to show parole unsuitability. Rather, he claims that the Board must articulate some "nexus" between the factors tending to show parole unsuitability and his present danger to society. As this does not reflect the law in California, let alone clearly established law for the purposes of AEDPA review, Petitioner's argument is without merit.[2/]

Petitioner further claims that the Board may not rely on the acts of his co-defendant in determining that the commitment offense was especially heinous, atrocious, or cruel. According to Petitioner, he "did not commit, attempt to commit, or contemplate murder or physical injury" in robbing five people at gunpoint. (Pet. at 14.) However, this claim presents no federal issue, as the way in which particular offenses are evaluated by state parole boards is a question of state law. Moreover, Petitioner fails to cite any case indicating the Board may not consider the actions of co-conspirators when determining whether a crime is particularly heinous. Thus, to the extent that *Hill*'s some-evidence test is clearly established federal law, Petitioner fails to show that it was unreasonably applied by the state courts, and the petition must be denied.

**4.    The Board may rely on static factors to deny parole.**

Petitioner argues that due process precludes the Board from relying on his commitment offense and past criminal behavior to deny parole. This argument fails for a number of reasons.

---

2. The California Supreme Court is currently determining whether a reviewing court need ever examine an inmate's risk of danger to society under state law. *In re Lawrence*, 150 Cal. App. 4th 1511 (2007), review granted (Sept. 19, 2007). This decision has no impact on Petitioner's case, however, as state court decisions are not relevant to determine clearly established federal law.

1   First, the Board did not rely solely on static factors—on the contrary, the decision was also based

2   on Petitioner's disciplinary violations and lack of insight into the crime.  (Pet. Ex. A at 89-90.)

3   Second, California's parole provisions explicitly state that parole may be denied based on the

4   factors of an inmate's commitment offense. *Dannenberg*, 34 Cal. 4th at 1094; Cal. Penal Code §

5   3401; Cal. Code Regs. tit. 15, § 2402(c)(1).

6           Finally, and most importantly, no clearly established federal provides that the Board

7   cannot base a parole denial on the factors of an inmate's commitment offense or criminal history.

8   Moreover, the Supreme Court has never held that after a certain period of time, a criminal's past

9   behavior is no longer predicative of his future actions.  Although the Ninth Circuit held in *Biggs*

10  *v. Terhune*, 334 F.3d 910, 917 (9th Cir. 2003) that continuing reliance on an unchanging factor to

11  deny parole "may result in a due process violation," AEDPA does not permit the use of circuit

12  court dicta to overturn a valid state court decision. *Musladin*, ___ U.S. ___, 127 S. Ct. at 653;

13  *Kane*, 546 U.S. at 10; *Nguyen*, 477 F.3d at 718, 727; *Crater*, 491 F.3d at 1126, n. 8 (9th Cir.

14  2007), *Foote*, 492 F.3d at 1029-30, *Stenson*, 504 F.3d at 881; *Plumlee*, ___ F.3d ___, 2008 WL

15  151273 at *6.

16          The Ninth Circuit's decision in *Hayward v. Marshall*, 512 F.3d 536 (2008) (pet'n. for

17  rehr'g. pending) does not compel a different result.  In *Hayward*, the Ninth Circuit used state

18  appellate decisions (rather than Supreme Court jurisprudence) to determine that the inmate-

19  appellant's commitment offense no longer indicated that he would pose an unreasonable risk of

20  danger to society, and ordered the inmate's release. *Id.* at 543-544.  Not only is this decision not

21  final, but the court strictly limited its holding to the particular facts of the case, and held that due

22  process did not necessarily preclude the parole authority from relying on static factors to deny

23  parole. *Id.* at 547 fn 10.  More importantly, just like *Biggs*, *Sass*, and *Irons*, the *Hayward*

24  decision is circuit court authority that may not be used to overturn a valid state court decision.

25  Thus, *Hayward* has no impact on Petitioner's claim.

26          Because the dicta from *Biggs* and subsequent cases cannot be used to overturn a valid

27  state court decision.  Petitioner fails to prove that the state court decisions denying parole were

28  contrary to, or an unreasonable application of, clearly established federal law. .The petition must

1  be denied accordingly.

2  **5.    Petitioner provides no evidence that his sentence has been converted to life without the possibility of parole.**

3

4      Petitioner bears the burden of proving his allegations in a habeas corpus proceeding. *See*

5  *Johnson v. Zerbst*, 304 U.S. 458, 468-69 (1938). Petitioner's claim that he will never be paroled

6  is based on nothing more than conjecture, and ignores the fact that dynamic factors entirely

7  within his control were bases for the Board's parole denial. As such, this claim must fail.

8  **B.    The State Court Decisions Upholding the Board's Parole Denial Were Based on a Reasonable Interpretation of the Facts.**

9

10      The second standard under AEDPA is that a state court habeas decision must be based on

11  a reasonable determination of the facts in light of the evidence presented. 28 U.S.C. §

12  2254(d)(2). Petitioner bears the burden of proving that it was objectively unreasonable for the

13  state courts to conclude that the Board acted in accordance with due process and that some

14  evidence supported the factual basis of the Board's parole denial. 28 U.S.C. § 2254(e)(1); *Juan*

15  *H. v. Allen*, 408 F.3d 1262, 1270 (9th Cir. 2005). Petitioner fails to meet this burden, as some

16  evidence in the record supports the Board's finding; furthermore, he does not provide any

17  evidence to show that the Board determination of parole suitability violated federal due process.

18  Petitioner may disagree with the Board's analysis, but that is not sufficient to prove that the state

19  courts' decisions were objectively unreasonable. Thus, because Petitioner fails to show that the

20  state courts' factual determinations were unreasonable under AEDPA standards, the petition

21  must be denied.

22  **CONCLUSION**

23      In order for this Court to grant habeas relief, Petitioner must prove that the state court

24  holdings were contrary to, or an unreasonable application of, clearly established federal law—not

25  Ninth Circuit dicta—or that the decisions were based on an unreasonable interpretation of the

26  facts. Petitioner fails to make such a showing. First, he received all the protections provided in

27  *Greenholtz*, the only clearly established federal law regarding the process due at parole

28  consideration hearings. Second, the some-evidence standard does not apply to Petitioner's case;

Answer to OSC; Mem. of P. & A.

*Jackson v. Curry*
08-0923 MMC

1   however, even if it did, the Board's decision is supported by some evidence of parole

2   unsuitability.  Third, clearly established federal law does not preclude the Board from relying on

3   static factors to determine parole suitability.  Finally, Petitioner provides no evidence to support

4   his claim that his sentence has been converted to life without parole.  Accordingly, the petition

5   for writ of habeas corpus should be denied.

6          Dated:  March 28, 2008

7                                        Respectfully submitted,

8                                        EDMUND G. BROWN JR.
                                         Attorney General of the State of California

9                                        DANE R. GILLETTE
                                         Chief Assistant Attorney General

10                                       JULIE L. GARLAND
                                         Senior Assistant Attorney General

11

12                                       ANYA M. BINSACCA
                                         Supervising Deputy Attorney General

13

14

15

16                                       AMBER N. WIPFLER
                                         Deputy Attorney General
                                         Attorneys for Respondent Warden B. Curry

17

18      40234964.wpd
19      SF2008400722

20

21

22

23

24

25

26

27

28

Answer to OSC; Mem. of P. & A.

                                                                    *Jackson v. Curry*
                                                                    08-0923 MMC

14

## DECLARATION OF SERVICE BY OVERNIGHT COURIER

Case Name:    **Jackson v. Curry**

No.:          **08-0923 MMC**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is: 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004.

On <u>March 28, 2008,</u> I served the attached

### ANSWER TO THE ORDER TO SHOW CAUSE;
### MEMORANDUM OF POINTS AND AUTHORITIES
(W/Exhibits A-C)

by placing a true copy thereof enclosed in a sealed envelope with the **California Overnight Courier Service**, addressed as follows:

Michael Gunning, Esq.
Law Office of Michael Gunning
2351 Sunset Street, Suite 170, PMB #511
Rocklin, CA 95765
         *Attorney for Petitioner*
         *Alex Jackson (C-73181)*

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on March 28, 2008, at San Francisco, California.

| S. Redd | | *(signature)* |
|---------|--|-----------|
| Declarant | | Signature |

40235068.wpd

# EXHIBIT   A

**FILED**

Los Angeles Superior Court

APR 13 2007

John A. Clarke, Executive Officer/Clerk

By _____ Deputy

IOSEPH M. PULIDO, S.C.C.

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

In re,                      )    Case No.: BH004069

ALEX JACKSON,          )    ORDER RE: WRIT OF HABEAS CORPUS

           Petitioner,        )

           On Habeas Corpus    )

                                )

_____ )

       The Court has read and considered petitioner's Writ of Habeas Corpus filed on June 16, 2006. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

       Petitioner was received in the Department of Corrections on September 20, 1983 after a conviction for first degree murder with a sentence of 27 years to life. His minimum parole eligibility date was December 19, 1998. The record reflects that on November 24, 1981, petitioner and his crime partners entered the home of a known drug dealer, with whom he had done business in the past, in order to steal money and cocaine. When they arrived several people were present in the home. Petitioner and one co-defendant forced their five victims to lie on the

ep                                 1

floor at gunpoint while they demanded money and drugs. Petitioner's co-defendant then shot at all five, killing one and injuring three (Reporter's Transcript, December 14, 2005, pp. 12-14).

The Board found petitioner unsuitable for parole after a parole consideration hearing held December 14, 2005. Petitioner was denied parole for three years. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense.

The Court finds that there is some evidence to support the Board's finding that "multiple victims were attacked, injured or killed in the same or separate incidents (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(B).) Although only one person was killed in the robbery, three others were injured. The Board also found that "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) The motive in this case was robbery. According to the record, petitioner often sold drugs supplied by the victim. He robbed her after she sold him cocaine that was "not good." (RT, p. 87.)

The Board also found that petitioner is unsuitable for parole due to his "previous record of violence" (Cal. Code Regs., tit. 15, §2402, subd. (c)(2).) There is some evidence to support this finding. The record reflects that petitioner has an extensive criminal history, starting at age thirteen. Although most of his offenses did not involve violence, he had two convictions for robbery and one crime against a child involving a sexual assault on a thirteen year old prior to the commitment offense.

Accordingly, the petition is denied.

Dated: _4/13/07_

_____
STEVEN VAN SICKLEN
Judge of the Superior Court

Clerk to give notice.

ep                                                    2

1

**Send copy of order to:**
Department of Justice – State of California
2  Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
3  110 West A Street, Suite 1100
San Diego, CA 92101
4

Michael J. Gunning, Esq.
5  2351 Sunset Street
Suite 170, PMB #511
6  Rocklin, CA 95765

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<table>
<tr><td colspan="2">

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

</td><td>Reserved for Clerk's File Stamp</td></tr>
</table>

| | |
|---|---|
| COURTHOUSE ADDRESS:<br>  Clara Shortridge Foltz Criminal Justice Center<br>  210 West Temple Street<br>  Los Angeles, CA 90012 | **FILED**<br>LOS ANGELES SUPERIOR COURT<br>MAY 0 7 2007<br>JOHN A. CLARKE, CLERK<br>BY _____<br>                    DEPUTY<br>JOSEPH M. PULIDO, S.C.C. |
| PLAINTIFF/PETITIONER:<br><br>  ALEX JACKSON | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:        233219<br><br>BH004069 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time                 ☒ Order re: Writ of Habeas Corpus
☐ Order to Show Cause                   ☐ Order
☐ Order for Informal Response         ☐ Order re:
☐ Order for Supplemental Pleading     ☐ Copy of

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to the cause.  I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

May 7, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
        Joseph M. Pulido

Michael J. Gunning, Esq.
2351 Sunset Street
Suite 170  PMB #511
Rocklin, CA 95765
Attorney for Petitioner Alex Jackson

Department of Justice
Office of the Attorney General of the State of
California
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | APRIL 13, 2007 | | | |
|-------|----------------|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

| | (Parties and Counsel checked if present) | |
|---|---|---|
| BH 004069<br>In re,<br>ALEX JACKSON,<br>Petitioner,<br>On Habeas Corpus | Counsel for Petitioner:<br><br>Counsel for Respondent: | |

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on June 16, 2006. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings (" Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received in the Department of Corrections on September 20, 1983 after a conviction for first degree murder with a sentence of 27 years to life. His minimum parole eligibility date was December 19, 1998. The record reflects that on November 24, 1981, petitioner and his crime partners entered the home of a known drug dealer, with whom he had done business in the past, in order to steal money and cocaine. When they arrived several people were present in the home. Petitioner and one co-defendant forced their five victims to lie on the floor at gunpoint while they demanded money and drugs. Petitioner's co-defendant then shot at all five, killing one and injuring three (Reporter's Transcript, December 14, 2005, pp. 12-14).

The Board found petitioner unsuitable for parole after a parole consideration hearing held December 14, 2005. Petitioner was denied parole for three years. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense.

The Court finds that there is some evidence to support the Board's finding that "multiple victims were attacked, injured or killed in the same or separate incidents (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(B).) Although only one person was killed in the robbery, three others were injured. The Board also found that "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) The motive in this case was robbery. According to the record, petitioner often sold drugs supplied by the victim. He robbed her after she sold him cocaine that was "not good." (RT, p. 87.)

The Board also found that petitioner is unsuitable for parole due to his "previous record of violence " (Cal. Code Regs., tit. 15, §2402, subd. (c)(2).) There is some evidence to support this finding. The record reflects that petitioner has an extensive criminal history, starting at age thirteen. Although most of his offenses did not involve violence, he had two convictions for robbery and one crime against a child involving a sexual assault on a thirteen year old prior to the commitment offense.

1

| Minutes Entered |
|---|
| 04-13-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | | |
|---|---|---|---|---|
| Date: | APRIL 13, 2007 | | | |
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

<table>
<tr><td></td><td colspan="2">(Parties and Counsel checked if present)</td></tr>
<tr><td>BH 004069<br>In re,<br>ALEX JACKSON,<br>      Petitioner,<br>    On Habeas Corpus</td><td>Counsel for Petitioner:<br><br>Counsel for Respondent:</td></tr>
</table>

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Michael J. Gunning, Esq.
2351 Sunset Street
Suite 170  PMB #511
Rocklin, CA 95765
Attorney for Petitioner Alex Jackson

Department of Justice
Office of the Attorney General of the State of California
110 West A Street, Suite 1100
Gregory J. Marcot, Deputy Attorney General
San Diego, CA 92101

Minutes Entered
04-13-07
County Clerk

ORIGINAL

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

FILED

Los Angeles Superior Court

JUN 16 2006

John A. Clarke, Executive Officer/Clerk

By_____, Deputy

In re

    ALEX JACKSON,

               Petitioner,

For Writ of Habeas Corpus.

)
)
)
)
)
)
)
)

Case No. _____

# *PETITION FOR WRIT OF HABEAS CORPUS;*

# *MEMORANDUM OF POINTS & AUTHORITIES*

MICHAEL J. GUNNING
State Bar # 194881
2351 Sunset Street
Suite 170  PMB # 511
Rocklin, CA  95765
Telephone: (916) 543-6120

# *TABLE OF CONTENTS*

Page No.

Custody                                                           2

Jurisdiction and Venue                                            2

Administrative Remedy                                             2

Statement of the Case and Facts                                  2

Criminal History, Sentencing, Commitment                         2

Facts of the Commitment Offense                                  3

Petitioner's Postconviction Record                               4

Evaluation of Petitioner's Parole Risk                           4

Petitioner's Minimum and Maximum Prescribed Prison Terms         5

Parole Proceedings                                               6

Due Process Requirements; Standard of Review                     7

Petitioner's Constitutional Claims                               9


I.    **Because No Evidence Supported The Panel's Finding
      That Petitioner's Parole Poses "An Unreasonable Risk Of
      Danger To Society Or A Threat To Public Safety," Denial
      On That Basis Abrogated Due Process**                       9


II.   **Because The Two Findings Stated By The Panel For
      Its Unreasonable Risk Ground Were Supported By
      No Evidence, Inapposite To The Record, And/Or
      Irrelevant To Parole Determination, Parole Denial
      On That Basis Abrogated Due Process**                       10

In re ALEX JACKSON, Petition for Writ of Habeas Corpus

# TABLE OF CONTENTS

## (Continued)

III. The Panel's Decision Based On Arguably Applicable
Offense And Prior Record Factors Abrogated Due
Process Because The Panel Established No Nexus To
Petitioner's Current Parole Risk And Because It Lacked
The Requisite Preponderance Of Evidence Indicating
That Petitioner's Parole Would Pose An Unreasonable
Risk Of Danger To Public Safety; No Rational Panelist
Who Reviewed The Evidence Of His Parole Suitability
Could Have Found A Preponderance Of Unreasonable
Risk                                                                14

IV. The Interminable Preclusion Of Petitioner's Parole
Based Solely On His Commitment Of First Degree
Murder Abrogates Due Process; Because Neither
His Offense Facts Nor Parole Suitability Otherwise
Can Improve, And Because He Has Served The
Maximum Prison Term Prescribed By The Regulations
For The Particular Facts Of His Offense, Denial Of
Petitioner's Parole Based On Those Unchangeable
Facts Has Converted His Prison Term To Life
Without Any Possibility Of Parole                                    20

V. The Executive Branch's Anti-Parole Policy Including
Its Constitution Of BPH In Violation Of Mandatory
Law Abrogates Due Process                                           25

Relief Requested                                                    28

Verification                                                        29

In re ALEX JACKSON, Petition for Writ of Habeas Corpus

## *TABLE OF EXHIBITS*

| | |
|---|---|
| EXHIBIT A | Certified transcript of December 14, 2005, parole hearing |
| EXHIBIT B | Abstract of Judgment |
| EXHIBIT C | Petitioner's psychological evaluation |
| EXHIBIT D | Petitioner's correctional evaluation |
| EXHIBIT E | *Coleman v. BPT* (E.D. Cal. 2005; no. 96-0783) |
| EXHIBIT F | Excerpts, Probation Department report for sentencing |
| EXHIBIT G | Certified transcript of plea hearing |
| EXHIBIT H | Certified transcript of sentencing hearing |

# *TABLE OF AUTHORITIES*

## Cases

*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 ...................................................... 8, 17, 20, 21, 22, 24

*Dunn v. U.S. Parole Commission* (10th Cir. 1987) 818 F.2d 742 ...................................................... 14

*Griggs v. Superior Court* (1976) 16 Cal.3d 341 ...................................................... 2

*Hudson v. Kane* (N.D. Ca. 2005) _____F.Supp.2d _____, 2005, WL 2035590 ............................... 8, 24

*In re Brown* (1967) 67 Cal.2d 339 ...................................................... 8

*In re Capistran* (2003) 107 Cal.App.4[th] 1299 ...................................................... 8, 16

*In re Caswell* (2001) 92 Cal.App.4[th] 1017 ...................................................... 8

*In re Clutchette* (1974) 39 Cal.App.3d 561 ...................................................... 8

*In re McClain* (1960) 55 Cal.2d 78 ...................................................... 8

*In re Minnis* (1971) 7 Cal 3d 639 ...................................................... 7

*In re Monzo* (1973) 33 Cal.App.3d 144 ...................................................... 8

*In re Powell* (1988) 45 Cal.3d 894 ...................................................... 2, 8

*In re Ramirez* (2001) 94 Cal.App.4[th] 549 ...................................................... 21

*In re Rosenkrantz* (2000) 80 Cal.App.4[th] 409 ...................................................... 12

*In re Rosenkrantz* (2002) 29 Cal.4[th] 616 ...................................................... 7, 17, 18, 19, 21

*In re Scott* (2004) 119 Cal.App. 4th 871 ...................................................... 12, 13, 15

*In re Scott* (2005) 133 Cal.App.4[th] 573 ...................................................... 7, 8, 16, 17, 19, 24

*In re Sena* (2001) 94 Cal.App.4th 836 ...................................................... 2

*In re Shaputis* (2005) 135 Cal.App.4[th] 217 ...................................................... 12

*In re Smith* (2003) 114 Cal.App.4[th] 343 ...................................................... 12, 15, 17

*Irons v. Warden,* (E.D.Cal. 2005) 358 F. Supp. 2d 936 ...................................................... 8, 17, 23, 24, 25

*McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895 ...................................................... 7, 15

*Montoya v. U.S. Parole Commission,* 908 F.2d 635 (10th Cir. 1990) ...................................................... 14

In re ALEX JACKSON, Petition for Writ of Habeas Corpus

# TABLE OF AUTHORITIES

## *(continued)*

**Statutes**

Pen.C. § 1508 ................................................................................................................. 2

Pen.C. § 3041 ................................................................................... 6, 7, 13, 20, 24, 26

Pen.C. § 3041.1 ............................................................................................................. 25

Pen.C. § 3041.2 ............................................................................................................. 25

Pen.C. § 5075 ........................................................................................................... 27, 28


**Regulations**

15 CCR § 2000 ....................................................................................................... 3, 8, 16

15 CCR § 2401 ............................................................................................................. 6, 7

15 CCR § 2402 ............................................................................. 6, 7, 8, 10, 11, 13, 16, 18

15 CCR § 2403 ............................................................................................................... 5

15 CCR § 2406 ............................................................................................................... 5

15 CCR § 2407 ............................................................................................................... 5

15 CCR § 2410 ............................................................................................................... 5

15 CCR § 2450 ............................................................................................................... 8


**Constitutional Provisions**

Cal.Const., Art.VI, § 10 ................................................................................................. 2

MICHAEL J. GUNNING
State Bar # 194881
2351 Sunset Street
Suite 170  PMB # 511
Rocklin, CA  95765
Telephone: (916) 543-6120

Counsel for Petitioner

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

|  |  |
|---|---|
| In re | ) Case No. _____ |
|  | ) **PETITION FOR WRIT** |
|  | ) **OF HABEAS CORPUS;** |
| ALEX JACKSON, | ) |
| Petitioner, | ) **MEMORANDUM OF** |
|  | ) **POINTS & AUTHORITIES** |
| For Writ of Habeas Corpus. | ) |

Pursuant to the claims, facts, authorities, and exhibits herein, petitioner, through counsel, seeks issuance of a writ of habeas corpus directing respondent Board of Parole Hearings (BPH) to modify its decision in petitioner's parole hearing conducted on December 14, 2005 (Exhibit A), to reflect that, based on his record and the State's parole statutes and regulations, petitioner is suitable for parole, to convene a hearing for the sole purpose of determining his prison term and parole date and, if said date has lapsed, to release petitioner on parole and to credit his parole term with the number of days during which he has been confined beyond said term.

### Custody

Petitioner is confined by the California Department of Corrections and Rehabilitation (CDCR) at the Correctional Training Facility, Soledad, California, Anthony Kane, Acting Warden.

### Jurisdiction and Venue

Habeas corpus is the remedy for due process violations by BPH. (*In re Powell* (1988) 45 Cal.3d 894, 903.) Petitioner was prosecuted in and will parole to Los Angeles County. (Exhibit A, p. 1.) This Court has original jurisdiction to issue the writ (Cal.Const., Art. VI, §10; Pen.C. §1508), and venue to adjudicate the petition. (*Griggs v. Superior Court* (1976) 16 Cal.3d 341, 344; see *In re Sena* (2001) 94 Cal.App.4th 836.)

### Administrative Remedy

BPH provides no administrative remedy for review of claims contesting a parole decision.

## *STATEMENT OF THE CASE AND FACTS*

### Criminal History, Sentencing, Commitment

Petitioner had many arrests and convictions (mostly non-violent) as a juvenile and adult. (Exhibit A, pp. 15-20.) He does not contest the extent and seriousness of his criminal record prior to the commitment offenses.

Pursuant to a guilty plea to first degree felony murder, the Los Angeles County Superior Court imposed life without parole. After the Court

of Appeal (case no. 2 Crim. B001409) set aside the special circumstance allegation, the Los Angeles Superior Court re-sentenced petitioner to 25 years-to-life plus a two-year determinate weapon enhancement. Kidnapping and robbery terms were run concurrently. (Exhibit B.)

Petitioner was committed to prison on September 20, 1983. His minimum eligible parole date (MEPD)[1] lapsed on December 19, *1998*. (Exhibit A, p. 1.)

## Facts of the Commitment Offense

On November 24, 1981, petitioner and codefendant Gray, armed, went to Barbara Martin's (a known drug dealer) a "dope pad" where several people were getting 'high," to steal drugs and money. Upon entering, they forced the victims into the bedroom and made them lie on the floor after demanding to know where their drugs and money were. When petitioner left the room to get the loot, Gray opened fire, killing Fletcher, and injuring Martin, Floyd, and McElroy. Marin and McElroy testified that they had been shot by Gray after they heard petitioner tell Gray there was to be "no shooting." The perpetrators took about one ounce of cocaine and $2,400 cash, which they split. Petitioner disposed of his gun, which had not been fired. The Court acknowledged that Gray, not petitioner, harbored the intent to kill, and that petitioner was not the shooter. (Exhibit A, pp. 10-15; exhibit D, pp. 1-2; exhibit F, p. 4; exhibit G, p. 4; exhibit H, p. 2.)

---

[1] The "minimum eligible parole date" (MEPD) is defined in the regulations as "the earliest date on which an ISL or life prisoner may legally be released on parole." (15 CCR § 2000(b)(67).)

## Petitioner's Post-conviction Record

Petitioner received three disciplinary violations during his first four years in prison. He has maintained an exemplary record since 1987, receiving one (non-serious) infraction in 2000 for using another inmate's privilege card. (Exhibit A, p. 46.) He has completed all applicable therapy and self-help programming available, including NA, 12-Steps, AA, the Dry-and-Sober Program, Anger Management, the Impact Program, Distance Learning, Training in Non-Violence. He has obtained his GED, completed numerous college courses with high grades, become State-certified in Dry Cleaning, and trained as a maintenance engineer. His work supervisors' reports are excellent, he has organized and contributed to charitable causes, tutored the Teaching Reading to Adults Program, and his file contains many laudatory memoranda for his work, conduct, and reform. The Board has approved his parole plans which include a residence, offers of employment, and extensive family and community support. The victim's family does not oppose his parole. See exhibit A, pp. 35-45, 52-62; exhibit D, pp. 8-25.

## Evaluation of Petitioner's Parole Risk

Petitioner underwent an extensive psychological evaluation prior to his parole hearing, conducted by one of the Board's forensic psychologists, Joe Reed, Ph.D. Dr. Reed confirmed that petitioner harbors sufficient remorse, has gained substantial insight into his former behavior, and poses a negligible parole risk, i.e.:

> If released to the community, his violence potential is considered to be ***no more than that of the average citizen in the community***." (Exhibit C, p. 6; emphasis added.)

Dr. Reed further explained:

> There are no significant risk factors which may be precursors
> to violence for this individual.  (Ibid.)

In petitioner's correctional evaluation, His Counselor, the Supervising

Counselor, the Facility Captain, and the Parole Representative, concluded:

> Jackson . . . has a multitude of family waiting to help and has
> skills on which to rely for employment.  Although Jackson's
> past is colorful to say the least, he displays an enlightened
> maturity and emotional stability which depicts him, as a far
> different individual than when his incarceration began.  On
> an overall scale, his disciplinary history was relatively minor
> in nature.  I do feel that Jackson will succeed upon release
> and exhibit the necessary intelligence and common sense in
> his post release decisions to keep from derailing.  (Exhibit D,
> p. 6.)

### <u>Petitioner's Minimum and Maximum Prescribed Prison Terms</u>

When petitioner was finally committed to prison, he had been

awarded a total of 2259 days of pre-sentencing term credits for his time in

jail custody.  (Exhibit B.)  He became eligible to parole on his MEPD of

December 19, 1998.  (Exhibit A, p. 1.)  The maximum prison term

prescribed by BPH regulations for the particular facts of petitioner's first

degree murder and other offenses was *22 years, 8 months*, which he fully

served by *May 1, 2006.*[2]

---

[2] The maximum base term prescribed for the first degree murder was 28 years (see 15 CCR § 2403(b), subsec. I-A (previous relationship, prisoner did not directly cause death), to which the Board would add 1 year for the weapon enhancement (15 CCR § 2406) and 6 years for the concurrent kidnapping and robbery terms (one-half of the 12-year total, per 15 CCR § 2407(b)(4)), from which the aforementioned 2259 days of pre-sentencing credits and an additional 68 months of post-conviction credit (4 months for each disciplinary-free year in prison per 15 CCR § 2410) would be deducted, resulting in a net maximum prison term of 22 years, 8 months, which lapsed on May 1, 2006.

In re ALEX JACKSON, Petition for Writ of Habeas Corpus; P & As – Page 5

## Parole Proceedings

Petitioner was denied parole by BPH panels in 1997 and 2002, based upon his offense, prior criminal record, and early prison misconduct. Accordingly, the previous hearing panels refused to set petitioner's prison term or a parole date.[3]

On December 14, 2005, despite meeting all parole requirements and having achieved maximum parole suitability under the regulations, petitioner was again denied parole by another BPH hearing panel based on his commitment offense and prior record. The panel recited its boilerplate reasons for finding him unsuitable:

> You . . . would pose an unreasonable risk of danger to society or a threat to public safety if released from prison at this time.
>
> . . . the gravity of the offense [which] was carried out in an especially cruel and callous manner. It involved multiple victims . . . The offense was carried out in a dispassionate and calculated manner . . . which demonstrates an exceptionally callous disregard for human suffering. The motive for the crime was very trivial in relationship to the offense . . .
>
> . . . You had incurred a very, very lengthy, lengthy criminal history dating back to the age of 13. (Exhibit A, pp. 83-84.)

---

[3] The parole statutes and regulations prescribe a two-step process: The panel first determines whether the inmate is suitable or unsuitable for parole based on a preponderance of the evidence assessing whether parole would pose "an unreasonable risk of danger" to "public safety." The panel proceeds to the second step of determining the length of the prison term and a parole date only for inmates it finds to be suitable. (Pen.C. § 3041(b); 15 CCR §§ 2401, 2402(a), (b).)

In re ALEX JACKSON, Petition for Writ of Habeas Corpus; P & As – Page 6

Accordingly, the panel found petitioner unsuitable for parole for the third time since he became eligible to parole *eight years* earlier, based solely on its recitation of codified factors of his commitment offense and his prior criminal record.

In an allegedly "separate" decision, the panel deferred petitioner's subsequent hearing for three years (two years more than the standard one-year denial) based on the fact that "you have been convicted of murder first" and a re-recitation of most of the same grounds it recited moments before for its unsuitability finding. (Exhibit A, p. 86.)

## *DUE PROCESS REQUIREMENTS;*
## *STANDARD OF REVIEW*

1. California parole law provides indeterminately sentenced inmates a liberty interest in parole protected by due process. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 621 [*Rosenkrantz*]; *McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895, 901-903 [*McQuillion*].)

2. Petitioner's protected liberty interest required his being granted parole because he was eligible to parole and had been evaluated not to pose an unreasonable risk of danger to public safety. (Pen. C. § 3041(a); 15 CCR §§ 2401, 2402(a).)

3. Parole denial based on some evidence of an egregious commitment offense may violate due process if the panel did not duly consider and weigh *all* of the evidence in the record favoring parole suitability. (*In re Scott* (2005) 133 Cal.App.4th 573, 594 et seq.; see 15 CCR § 2402(b); *In re Minnis*

(1972) 7 Cal. 3d 639, 646; *In re Capistran* (2003) 107 Cal.App.4th 1299, 1306.)

4. Each finding by a panel to justify a parole suitability determination must be supported by "good cause." (*In re Powell* (1988) 45 Cal.3d 894, 901; *In re Brown* (1967) 67 Cal.2d 339, 342;, *In re McClain* (1960) 5 Cal.2d 78, 87; *In re Caswell* (2001) 92 Cal.App.4th 1017, 1024, 1026; *In re Clutchette* (1974) 39 Cal.App.3d 561, 565; *In re Monzo* (1973) 33 Cal.App.3d 144, 147; 15 CCR § 2450.) Good cause is defined by BPH as "***a preponderance of the evidence*** that there is a factual basis and good reason for the decision made." (15 CCR § 2000)(b)(49); emphasis added).

5. Accordingly, the "some evidence" standard applied by some *reviewing courts* to assess the sufficiency of evidence supporting an agency's decision a legally untenable basis on which a BPH panel may base a decision that an inmate is unsuitable or parole.

6. Although commitment offense factors may initially be a sufficient basis for unsuitability, each must be supported by relevant, reliable evidence (*Rosenkrantz*, 29 Cal.4th at p. 658; 15 CCR § 2402(b)), and such unchangeable factors may not serve to deny parole interminably to a parole qualified inmate, extinguishing the possibility of parole. (*In re Scott* (2005) 133 Cal.App.4th 573, 595, citing *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916-917 ["*Biggs*"]; *Irons v. Warden of California State Prison-Solano* (E.D. Cal. 2005) 358 F.Supp.2d 936, 947 ["*Irons*"]; *Hudson v. Kane* (N.D. Ca. 2005) __F.Supp.2d__, 2005 WL 2035590, at p. 9.)

## PETITIONER'S CONSTITUTIONAL CLAIMS

### I. BECAUSE NO EVIDENCE SUPPORTED THE PANEL'S FINDING THAT PETITIONER'S PAROLE POSED AN "UNREASONABLE RISK OF DANGER TO SOCIETY OR A THREAT TO PUBLIC SAFETY," DENIAL ON THAT BASIS ABROGATED DUE PROCESS

The sole ground stated by the panel for finding petitioner unsuitable was the its recitation of the codified criterion, stating that he poses "an unreasonable risk of danger to society or a threat to public safety if released from prison at this time." (Exhibit A, p. 83.) The panel's recitation of the code verbatim including the disjunctive, "or," not indicating which of the two clauses (or both) applied, reflects the boilerplate nature of the decision.

The two findings set forth by the panel in support of that conclusion are detailed in the following section.

Parole denial based on the "unreasonable risk" ground denied due process; it was supported by no evidence whatsoever. *All* reliable evidence before the panel that addressed petitioner's current and future dangerousness and parole risk assessed these factors to be low. No evidence assessed it to be anywhere near the panel's "unreasonable risk of danger" finding.

The only reliable evidence assessing petitioner's current dangerousness and parole risk was petitioner's forensic evaluation, in which Dr. Reed concluded that, "[i]f released to the community, his violence potential is considered to be no more than that of the average citizen in the community." (Exhibit C, p. 6.) Petitioner's correctional evaluation likewise determined his parole risk to be low. (Exhibit D, p. 6.)

Because petitioner's record consistently establishes his low parole risk and *no* evidence addressing that factor supported the panel's finding of

"unreasonable" risk, finding petitioner to be unsuitable for, and denying parole on that basis abrogated due process.

## II. BECAUSE THE TWO FINDINGS STATED BY THE PANEL FOR ITS UNREASONABLE RISK GROUND WERE SUPPORTED BY NO EVIDENCE, INAPPOSITE TO THE RECORD, AND/OR IRRELEVANT TO PAROLE DETERMINATION, PAROLE DENIAL ON THAT BASIS ABROGATED DUE PROCESS

### 1. Prior Criminal Convictions

The panel stated as its second finding:

> . . . You had incurred a very, very lengthy, lengthy criminal history dating back to the age of 13. (Exhibit A, p. 84.)

The unsuitability factor utilized by the panel is defined:

> "Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim . . ." (15 CCR § 2402(c)(2).)

Petitioner suffered several juvenile and adult convictions, only two of which could be considered "violent," an armed robbery as an adult, and an attempted rape when he was 17 years old involving a female 3½ years younger than petitioner. See exhibit D, pp. 3-4.

Although petitioner's criminal record prior to the commitment offense was extensive, it was largely non-violent and did not fit the codified criterion for unsuitability, nor did the panel cite any evidence establishing a nexus to his current parole risk. Considering the forensic evaluator's conclusion that

petitioner has fully reformed from his earlier misconduct and poses no risk for violence beyond that of "the average citizen," the omissions were crucial and abrogated due process.

## 2. The Commitment Offense

The panel's remaining finding in support of its "unreasonable risk" ground was its recitation of codified factors depicting the commitment offense of first degree murder, specifically:

> . . . [the offense] was carried out in an especially cruel and callous manner.

> It involved multiple victims . . .

> . . . [the offense] was carried out in a dispassionate and calculated manner . . .

> . . . which demonstrates an exceptionally callous disregard for human suffering.

> The motive for the crime was very trivial in relationship to the offense . . .

> (Exhibit A, p. 83.)

The panel thus recited verbatim all five of the codified factors listed under 15 CCR § 2402(c) for first degree murders that are "especially heinous, atrocious, or cruel." Because petitioner's life offense, a fairly typical first degree murder, whether considered in the abstract or compared to other first degree murders, and particularly his role in it, neither planning nor condoning a murder nor being the shooter, was not "especially heinous, atrocious, or cruel," the factors, set forth as examples of such a crime, were inapplicable.

The panel cited no evidence whatsoever that petitioner's actions were "especially cruel and callous" for a first degree murder, that the offense was "dispassionate and calculated" (it was conceded that the intent was not to kill, but to rob the victim), or that petitioner displayed "exceptionally callous disregard for human suffering," The witnesses and trial court acknowledged that petitioner advised Gray there was to be "no shooting," and that only Gray harbored an intent to kill and fired the shots. See exhibit F, p. 4; exhibit G, p. 4; exhibit H, p. 2.

Our courts have repeatedly chastised BPH for its panels' repetitious, baseless recitation of these offense factors to support every finding of parole unsuitability. In *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, rev. den., the court found that no evidence supported the panel's finding that Rosenkrantz displayed "an exceptionally callous disregard for human suffering." (*Id.*, p. 425). In *In re Shaputis* (2005) 135 Cal.App.4th 217, 227-228, no evidence supported the finding that Shaputis engaged in conduct reflecting an "exceptionally callous disregard for human suffering." The "exceptionally callous or cruel" factor must be supported by evidence that the defendant cruelly or callously exacerbated the victim's suffering before death or gratuitously increased or provoked the victim's pain, suffering or death. (*Ibid*; see *In re Smith* (2003) 114 Cal.App.4th 343, 367 [no evidence that Smith acted with the requisite "cold, calculated dispassion"].)

In *In re Scott* (2004) 119 Cal.App.4th 871, 891, the court noted that "all murders involve some callousness, i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feeling and suffering of others"; to demonstrate an "exceptionally callous disregard for human suffering" the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of murder.

Finally, the codified "exceptionally callous disregard for human suffering" factor applies by definition to murders akin to "execution-style killing(s)" (15 CCR § 2402(c)(1)(B), a category inapplicable to petitioner's offense.

The "very trivial" motive sub-factor recited by the panel was inapplicable because (1) any motive is trivial for a first degree murder, and (2) the established motive for the offense, to steal drugs and money, although it can never justify or excuse such an offense, was not at all "very trivial." As the Court of Appeal recently explained:

> . . . The offense committed by most prisoners serving life terms is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed "trivial." The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must "normally" be given release dates when they approach their minimum eligible parole dates. (Pen.Code § 3041, subd. (a).) The governing statute also states that the Board shall set a release date
>
> "unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen.Code § 3041, subd. (b).) This language means a "more lengthy period of incarceration" is called for where the gravity of the offense or offenses of the prisoner in question is more indicative of a danger to the public if the prisoner is released than would ordinarily be the case.
>
> (*In re Scott* (2004) 119 Cal.App.4[th] 871, 892-894.)

Finally, while petitioner concedes that the offense had multiple victims, a fact he can never change, his personal role in the offenses was minimal: he allegedly kicked one of the victims but did not commit, attempt to commit, or contemplate murder or physical injury.

Because the panel failed to consider or mention petitioner's role in the offense (case law for offender as well as crime) and, more importantly, because the first degree murder was not in the oft-used "heinous, atrocious, and cruel" category for that offense needed to qualify for the sub-factors recited, the panel's use of the criteria to deny parole abrogated due process and petitioner's protected liberty interest in parole.

### III.  The Panel's Decision Based on Arguably Applicable Offense and Prior Record Factors Abrogated Due Process Because the Panel Established no Nexus to Petitioner's Current Parole Risk and Because it Lacked the Requisite Preponderance of Evidence Indicating That Petitioner's Parole Would Pose an Unreasonable Risk of Danger to Public Safety;

### No Rational Panelist Who Reviewed the Evidence of his Parole Suitability Could Have Found a Preponderance of Unreasonable Risk

### A.

A parole authority's bald recitation of commitment offense factors without articulating a rational nexus between the factors alleged and the inmate's current parole risk, denies due process because it is arbitrary in the extreme. See *Montoya v. U.S. Parole Comm.* (10th Cir. 1990) 908 F.2d 635, 639-640; *Dunn v. U.S. Parole Comm.* (10th Cir. 1987) 818 F.2d 742, 745.

A nexus may exist if an inmate who committed an offense when alcoholically intoxicated continues to use alcohol while in prison, or if one committed for drug trafficking has since been involved with drugs, or if an inmate under consideration had committed an offense related to gang activity and still participates in a gang. No such factors exist in petitioner's case or were set forth by the panel.

The panel's mere recitation of boilerplate verbiage describing petitioner's offense as the basis for finding him to be currently unsuitable for parole, without articulating any nexus between those factors and his current parole risk (if any), abrogated his right to due process and his protected liberty interest in parole because it was arbitrary in the extreme. The finding was particularly arbitrary in light of petitioner's forensically verified low parole risk. Please see *In re Scott, supra,* 119 Cal.App.4th at p. 897 [unsuitability grounds a mere "mouthing of conclusionary words" without "factual underpinning," citing *McQuillion,* 306 F.3d at p. 902]. *In re Smith, supra,* 114 Cal.App.4th at p. 371 [no "chain of reasoning" between "immutable" factor of past drug use and *current* parole risk, especially in view of long period of abstinence].

## B.

For years BPH panels have untenably adopted the "some evidence" standard reserved for a <u>reviewing court's</u> assessment of executive decisions by routinely finding prospective parolees unsuitable for parole based on *some* or *any* evidence of a serious commitment offense. Petitioner's case is a classic example.

BPH decisions must be based on "good cause," defined as "*a preponderance of the evidence* that there is a factual basis and good reason

for the decision made." (15 CCR § 2000)(b)(49);emphasis added.) Please see p. 8, *supra*, and authorities cited. Even a parole decision supported by some evidence may abrogate due process if the panel did not consider and weigh all parole-favorable evidence. (*In re Scott, supra*, 133 Cal.App.4[th] at p. 596 et seq.; *In re Capistran, supra*, 107 Cal.App.4[th] at p. 1306.)

15 CCR § 2402(c) lists six "circumstances tending to show *unsuitability*" of which but one, the commitment offense (arguably) was applicable. The other five offense factors were either inapplicable as detailed above, or not cited by the panel because they were absent or contrary to petitioner's record ("sadistic sexual offenses," "psychological factors," "institutional behavior," "previous record of violence," and "unstable social history").

15 CCR § 2402(d) lists nine "circumstances of *suitability*." Seven of the eight factors applicable to petitioner (BWS applies only to female prisoners), all but the motive of stress, favored his parole ("no juvenile record of violence," no "significant history of violent crime," "stable social history," "signs of remorse," inmate's "present age reduces the probability of recidivism," "realistic plans for release/marketable skills that can be put to use upon release," and good "institutional behavior").

Because of the fourteen codified parole suitability and unsuitability factors in the regulations that apply to petitioner, twelve favored his parole, finding him unsuitable for parole based solely on his offense while ignoring many of the compelling suitability factors applicable satisfied neither the preponderance of the evidence standard nor fundamentally fair decision-making required by due process.

Petitioner is not asking the Court to abandon its standard of *review*. He asks the Court to determine if the panel violated due process by

rendering a decision it knew to be contrary to *its* preponderance of the evidence standard for parole decisions.

In *In re Scott, supra*, 133 Cal.App.4[th] 573, the California Court of Appeal explained why reliance on the gravity of a murder did not constitute "some evidence" that Scott was currently unsuitable for parole; it was far outweighed by evidence of Scott's exemplary reform and low parole risk confirmed by his forensic evaluations. The Court explained:

> The Governor's determination that the gravity of Scott's offense shows him unsuitable for release is doubly flawed. Not only is the determination unsupported by "some evidence," but the Governor failed to consider a factor indicative of suitability that he was required to take into account. We address the latter problem before turning to the insufficiency of the evidence of unsuitability . . .

> [P]utting aside factors relating to his offense and prior conduct, there is no dispute that all other applicable regulatory criteria clearly indicate Scott is suitable for release on parole. He has no juvenile record, possesses a stable social history, has performed acts which tend to indicate the presence of remorse, his age reduces the probability of recidivism, he has made realistic plans for release, and his activities while in prison indicate an enhanced ability to function within the law. The chief reason the Governor nevertheless found Scott unsuitable for release was the gravity of his offense.

> . . . [the] Governor's assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense "alone" is correct *(Rosenkrantz, supra,* 29 Cal.4th at p. 682, 128 Cal.Rptr.2d 104, 59 P.3d 174) [ ] but the proposition must be properly understood . . . Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair *(In re Smith* (2003) 114 Cal.App.4[th] 343, 372, 7 Cal.Rptr.3d 655), and "runs

contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (*Biggs v. Terhune, supra,* 334 F.3d at p. 917.) . . .

The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time [FN9] (*Irons v. Warden of California State Prison--Solano* (E.D. Cal. 2005) 358 F.Supp.2d 936, 947, fn. 2.) Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny . . .

. . . Under Board regulations, aspects of the commitment offense may indicate unsuitability or suitability for release. The offense is indicative of *unsuitability* when it was committed "in an especially heinous, atrocious or cruel manner" (Cal.Code Regs, tit. 15, § 2402, subd. (c)(1)) . . . there is not "some evidence" that the gravity of Scott's offense shows him unsuitable for release . .

Before explaining the insufficiency of this evidence, it is necessary to remember that denial of parole based upon the nature of the offense alone may rise to the level of a due process violation . . .

For example, premeditation was considered in *Rosenkrantz* because, though the prisoner had been convicted only of second degree murder, the evidence showed " 'a full week of careful preparation, rehearsal and execution,' " and that the prisoner, who "fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he lay on the pavement," carried out the crime with "planning, sophistication or professionalism."

*(Rosenkrantz,* at p. 678, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

. . . *the record contains no evidence* Scott committed his offense "in an especially heinous, atrocious or cruel manner," or *that the nature of his crime indicates he poses a continuing threat to the public safety if released.* Indeed, the record contains abundant *uncontradicted* evidence to the contrary. *All* of the many psychological evaluations of Scott [indicated] there was a low risk he would commit another violent act if released . . .The life prisoner evaluation report prepared by the Department of Corrections reached the same conclusion . . .he "would pose a low degree of threat to the public at this time if released from prison." *The Governor may believe Scott would pose an unreasonable risk of danger to society if now released from prison, but that opinion finds no factual support whatsoever in the record that was before him.*

(*In re Scott, supra,* 133 Cal.App.4[th] at pp. 594-596; rev. den. November 30, 2005.)

Because only two factors at most – the commitment offense and the lack of demonstrable stress at the time of the offense – could arguably support a finding of unsuitability, and because no rational panelist could have found based on a weighing of all evidence in the record addressing petitioner's current suitability for parole that a preponderance of that evidence indicated that his parole currently poses an unreasonable risk of danger to public safety, the panel's denial of parole based solely on some evidence of a serious commitment offense abrogated petitioner's right to due process and his protected liberty interest in parole.

## IV. THE INTERMINABLE PRECLUSION OF PETITIONER'S PAROLE BASED SOLELY ON HIS COMMITMENT OF FIRST DEGREE MURDER ABROGATES DUE PROCESS;

### BECAUSE NEITHER HIS OFFENSE FACTS NOR PAROLE SUITABILITY OTHERWISE CAN IMPROVE, AND BECAUSE HE HAS SERVED THE MAXIMUM PRISON TERM PRESCRIBED BY THE REGULATIONS FOR THE PARTICULAR FACTS OF HIS OFFENSE, DENIAL OF PETITIONER'S PAROLE BASED ON THOSE UNCHANGEABLE FACTS HAS CONVERTED HIS PRISON TERM TO LIFE WITHOUT ANY POSSIBILITY OF PAROLE

The authorities cited at pp. 7-8 that permit parole denial to an otherwise qualified prisoner whose commitment offense was particularly egregious when compared with other examples of the offense, place reasonable limits on such discretion to preclude repeated or interminable denial of parole on that basis. Because the facts and circumstances of commitment offenses can never change, a contrary policy would convert sentences like petitioner's 15-years-to-life with the possibility of parole, to life without the possibility of parole. See *Biggs, supra,* 334 F.3d at p. 916. California's courts warn:

> [T]he Legislature has clearly expressed its intent that when murderers—who are the great majority of indeterminate sentences—approach their minimum eligible parole date, the Board "shall normally set a parole release date." (Pen.C. § 3041, subd. (a).) The Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses should not

operate so as to swallow the rule that parole is
"normally" to be granted . . .

(*Rosenkrantz*, 29 Cal.4th at p. 683, citing *In re
Ramirez* (2000) 94 Cal.App.4th 549, 570.)

The Ninth Circuit reviewed the constitutional propriety of a BPH
panel's use of a first degree murder commitment offense to find a prisoner
unsuitable for parole at his <u>first</u> hearing.  The Court found no evidence to
support most of the panel's grounds for unsuitability, but held that a
particularly egregious commitment offense could be an appropriate basis for
finding such a prisoner unsuitable for parole at an *initial* parole hearing.
The Ninth Circuit cautioned:

> As in the present instance, the parole board's sole
> supportable reliance on the gravity of the offense
> and conduct prior to imprisonment to justify denial
> of parole can be initially justified as fulfilling the
> requirements set forth by state law.  Over time,
> however, should Biggs continue to demonstrate
> exemplary behavior and evidence of rehabilitation,
> denying him a parole date simply because of the
> nature of Biggs' offense and prior conduct would
> raise serious questions involving his liberty interest
> in parole. . . .
>
> A continued reliance in the future on an
> unchanging factor, the circumstances of the
> offense and conduct prior to imprisonment, runs
> contrary to the rehabilitative goals espoused by the
> prison system and could result in a due process
> violation.
>
> (*Biggs, supra*, 334 F.3d at pp. 916-917.)

*Biggs*' holding has been relied on in addressing the issue here raised by petitioner, most recently in decisions by the U.S. District Courts for the Eastern and Northern Districts of California and now by the California Court of Appeal.

> In finding petitioner unsuitable at this fifth parole suitability hearing, the panel relied exclusively on unchanging factors: the commitment offense and petitioner's drug use at the time of the offense. In *Biggs,* the Ninth Circuit stated that the BPT was "*initially* justified" in finding Mr. Biggs unsuitable based on the circumstances of the offense and his conduct prior to imprisonment. 334 F.3d at 916 (emphasis added). However, the Ninth Circuit was not specific as to when reliance on the circumstances of the offense and conduct prior to imprisonment would "run contrary to the rehabilitative goals espoused by the prison system" and result in a due process violation. 334 F.3d at 917.

> More important to the undersigned in assessing any due process violation is the fact that continuous reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole. The court asks rhetorically--what is it about the circumstances of petitioner's crime or motivation which are going to change? The answer is nothing. The circumstances of the crimes will always be what they were, and petitioner's motive for committing them will always be trivial. Petitioner has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial.

> Given that *no one* seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be

determined by such an arbitrary, remote possibility.
[FN2]

FN2. To a point, it is true, the circumstances of the
crime and motivation for it may indicate a petitioner's
instability, cruelty, impulsiveness, violent tendencies
and the like. However, after fifteen or so years in the
caldron of prison life, not exactly an ideal therapeutic
environment to say the least, and after repeated
demonstrations that despite the recognized hardships of
prison, this petitioner does not possess those attributes,
the predictive ability of the circumstances of the crime
is near zero.

(*Irons*, 358 F.Supp.2d at pp. 946-947.)

The U.S. District Court for the Northern District of California
likewise held:

Now before the Court is petitioner's third denial of
parole, which was the first denial, based solely on the
facts of the crime. Petitioner's present situation falls
under the same factual circumstances as *Biggs,* which
held that a prisoner's due process rights are not violated
the first time parole is denied based solely on the facts
of the crime.

Petitioner has subsequently had a fourth hearing in
August 2004, in which the BPT again denied parole
based on the facts of the crime . . . He is due for his fifth
parole hearing in August 2005.

A denial based on the unchanging facts of the crime at
the August 2005 hearing would make it the third time
that petitioner is denied parole solely on the basis of the
facts of his convicted offense. At that time, petitioner's
situation would be more factually similar to the *Irons*
case and would more clearly require analysis of the
concerns raised in *Biggs,* that continued denial based

solely on the facts of the crime can raise serious
questions of due process violations. (*Hudson v. Kane*
(N.D. Ca. 2005) __F.Supp.2d__, 2005 WL 2035590 at
p. 9.)

The <u>California Court of Appeal</u> has likewise adopted and relied on
*Biggs* in reversing a decision denying parole. See *In re Scott, supra,* 133
Cal.App.4th 573. The facts of petitioner's case including his exemplary
post-conviction record of reform and rehabilitation over the past seventeen
years are more compelling than those in *Biggs, Irons, Hudson,* or *Scott* in
which the same boilerplate unsuitability factors were employed as those
used to deny petitioner's parole grant.

Petitioner, a 49-year-old, fully reformed, rehabilitated, parole-
qualified individual, having achieved the maximum parole suitability
possible under BPH's regulations and the suitability factors listed therein,
was eligible to parole *7½ years ago* on his MEPD of December 19, *1998*.
The *maximum* prison term prescribed for the facts of his offense has lapsed.
See p.5, fn. 2. Yet, BPH continues to preclude his parole based on those
facts, which, like his parole suitability otherwise, cannot further improve.
BPH has thus modified petitioner's legislatively-prescribed prison term, 25
years-to-life with the possibility of parole, which Pen.C. § 3041(a) defines as
a *probability* of parole (panel "shall normally set a parole release date"), to
life with *no* possibility of parole. That result is particularly egregious
because petitioner did not kill, attempt to kill, or intend to kill, and he has
been evaluated by BPH's forensic staff to pose a risk to public safety
commensurate with that of "the average citizen."

Absent judicial intervention, petitioner's parole will *always* be
precluded because he cannot change the factors on which it is based –

unless, as the district court reasoned in *Irons*, some future panel arbitrarily decides that the previous panels were wrong or the factors do not apply. (358 F.Supp.2d at pp. 946-947.)  Basing petitioner's possibility of parole on such a whim is a result prohibited by the above-cited authorities, the State's parole laws, and the Due Process Clauses.

## V. THE EXECUTIVE BRANCH'S ANTI-PAROLE POLICY INCLUDING ITS CONSTITUTION OF BPH IN VIOLATION OF MANDATORY LAW ABROGATES DUE PROCESS

### A. The Anti-Parole Policy Abrogates Due Process Because it is Arbitrary in the Extreme and Contrary to Law

The anti-parole policy was initiated by former Governor Pete Wilson who, toward the end of his second term in the late 1990's, following an incident in which Willie Horton, a sex offender in Massachusetts, committed a rape while on furlough that impacted the presidential campaign of Senator Dukakis.  Using Pen.C. § 3041.1, Governor Wilson referred all cases of indeterminately sentenced prisoners (lifers), who had been granted parole but not yet paroled, to BPH, which rescinded nearly all of the paroles by deeming them to have been "improvidently" granted.  Most of those inmates are still imprisoned or have died.

On April 9, 1999, Governor Davis publicly proclaimed that he would exercise his authority under Pen.C. § 3041.2 to preclude the parole of all inmates who had been convicted of murder; he stated there would be "no exceptions – none."  Pursuant to that policy, only six paroles granted to such

prisoners (in over 8,000 hearings) were allowed to parole over the ensuing five-year period.[4]

After Davis was deposed by the voters, Governor Schwarzenegger's staff (the Governor is not involved in the process except to sign or authorize a staff member to sign the decisions) has continued the policy to a slightly lesser extent, reversing approximately 72% of the very few paroles granted by BPH in murder cases.

According to statistics issued by BPH on March 8, 2006, in 2005 BPH conducted hearings for 2,788 inmates whose commitment offense was murder, of which 152 (5.5%) were "granted" parole. Most of those "grants" were disapproved by BPH review staff or reversed by the Governor, allowing only thirty-one to parole.

Thus, only 1.1% of parole hearings for prisoners serving indeterminate sentences for murder results in an actual parole – compared to the parole statute's mandatory requirement that parole should "normally" be granted to such inmates at their initial hearings. (Pen.C. § 3041(a).)

Petitioner respectfully refers the Court to exhibit E, a decision in *Coleman v. Board of Prison Terms, et al.* (E.D. Cal. 2005), case no. 96-0783, currently under review in the Ninth Circuit, including evidence re-affirming existence of California's anti-parole policy.

---

[4] Petitioner will submit, on the Court's request, these statistics obtained from the Governors' office, BPH, and other sources.

In re ALEX JACKSON, Petition for Writ of Habeas Corpus; P & As – Page 26

## B. The Parole Determination Process Violates Due Process; It is Inherently Biased Against Parole Because BPH and its Panels' Constituency is Contrary to Statute

Penal Code § 5075 requires in pertinent part:

> "The selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross-section of the racial, sexual, economic, and geographic features of the population of the state."

Of the last thirty-four new commissioners appointed by governors, thirty-one were former law enforcement personnel (who helped to incarcerate the individuals they now judge by arresting and testifying against them), anti-parole Legislators (who passed laws to keep such inmates imprisoned longer), and/or crime victim advocates (whose sole proclaimed goal is to prevent all such paroles). The appointment of such biased commissioners is contrary to the statute's requirements. At the time of petitioner's hearing, all commissioners (except those "inherited" from the Youth Authority and Narcotics Boards when they merged with BPH) were in those categories. BPH has no commissioners from the State's lower or lower-middle economic strata or from the State's largest industries (farming, labor); only one commissioner is from the State's smallest thirty counties. Importantly, BPH, unlike other States' parole boards, has no members with training or qualification to determine parole. There are no former judges, public defenders, non-government lawyers, psychologists, psychiatrists, educators, or clergy. All are strictly political appointees to promote the governors' publicly proclaimed anti-parole mandate.

It would be practically impossible to constitute a parole board not inherently biased against petitioner and his parole. BPH's constituency violates the intent and the mandatory ("shall") language of Pen.C. § 5075, insures bias and fundamental unfairness, and violates the liberty interest and right to due process vested in petitioner by the State's parole laws protected by the Due Process Clauses of the Federal and State Constitutions.

## **RELIEF REQUESTED**

Based on petitioner's constitutional claims, and the facts, grounds, argument and authorities therefore set forth above, and the referenced exhibits, he respectfully seeks habeas corpus relief in an order directing BPH to modify its decision at his December 14, 2005, hearing to find him suitable for parole, to conduct a new hearing for the sole purpose of determining his prison term and a parole date commensurate with its regulations, to release petitioner on said date, or immediately if it has lapsed, and to reduce his parole term by the time that his imprisonment has exceeded said term after its reduction by the statutory and regulatory credits to which he is entitled.

Because the petition sets forth a prima facie case for relief, an order to show cause should issue directing briefing on the merits. (Rules of Court, Rule 4.551(c).)

Dated: 5/22/06 _____

Respectfully submitted,

Michael J. Gunning
Counsel for Petitioner

## **VERIFICATION**

I declare, under penalty of perjury, that the facts stated above are true.

DATED this 22 day of _____, 2006, at Rocklin, California.

Michael J. Gunning
Declarant

## *DECLARATION OF SERVICE BY MAIL*

Case Name:  **In re Alex Jackson**

I declare that I am a citizen of the United States.  I am over the age of 18 and am not a party to the within title cause.

On _MAY 24, 2006_ , I served the attached

**Petition for Writ of Habeas Corpus; Points & Authorities; Exhibits**

on the parties listed below by enclosing same in an envelope to which adequate postage was affixed, and depositing same at the United States Post Office in Walnut, California for mailing.

> **Attorney General**
> **110 W. A Street, Ste. 1100**
> **P.O. Box 85266**
> **San Diego, California 92186-5266**

I declare, under penalty of perjury, that the facts I have stated above are true and correct.

Dated _MAY 24_ , 2006, at Walnut, California

_Joseph Wasto_
Declarant

# EXHIBIT   B

ORIGINAL

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

COURT OF APPEAL - SECOND DIST.

FILED

JUN 2 8 2007

JOSEPH A. LANE _____ Clerk

D. NOLAN _____ Deputy Clerk

|  |  |
|---|---|
| In re | B199769 |
| ALEX JACKSON | (Super. Ct. No. BH004069) |
| on | (Steven R. Van Sicklen, Judge) |
| Habeas Corpus. | **ORDER** |

THE COURT:

The court has read and considered the petition for writ of habeas corpus, filed June 15, 2007. The petition is denied. There is some evidence to support the decision of the Board of Parole Hearings. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.)

_____     _____     _____
TURNER, P.J.                 ARMSTRONG, J                 KRIEGLER, J.

F I L E D

JUN 15 2007

ORIGINAL

# CALIFORNIA COURT OF APPEAL

## SECOND APPELLATE DISTRICT

JOSEPH A. LANE _____ Clerk

T. CHLEAND _____ Deputy Clerk

B 1 9 9 1 6 9

In re

ALEX JACKSON,

Petitioner,

For Writ of Habeas Corpus.

Case No. _____

KRASNABOBS

SC1AE:
A374677

X RCF - B00H09G(S)AID

BH04069

X RCF $

A374948

B178033 (S) w/d

# PETITION FOR WRIT OF HABEAS CORPUS;
# MEMORANDUM OF POINTS & AUTHORITIES

MICHAEL J. GUNNING
State Bar # 194881
2351 Sunset Street
Suite 170, PMB # 511
Rocklin, CA 95765
Telephone: (916) 543-6120

Counsel for Petitioner
Alex Jackson

Assigned to DIVISION FIVE

# TABLE OF CONTENTS

Page No.

Custody                                                          2

Jurisdiction and Venue                                           2

Administrative Remedy                                            2

Superior Court Remedy                                            2

Statement of the Case and Facts                                  3

Criminal History, Sentencing, Commitment                        3

Facts of the Commitment Offense                                  3

Petitioner's Postconviction Record                               4

Evaluation of Petitioner's Parole Risk                           4

Petitioner's Minimum and Maximum Prescribed Prison Terms         5

Parole Proceedings                                               6

Due Process Requirements; Standard of Review                     7

Petitioner's Constitutional Claims                              11


I.    **Because No Evidence Supported The Panel's Finding
      That Petitioner's Parole Poses "An Unreasonable Risk Of
      Danger To Society Or A Threat To Public Safety," Denial
      On That Basis Abrogated Due Process**                     11


II.   **Because The Two Findings Stated By The Panel For
      Its Unreasonable Risk Ground Were Supported By
      No Evidence, Inapposite To The Record, And/Or
      Irrelevant To Parole Determination, Parole Denial
      On That Basis Abrogated Due Process**                     12

## TABLE OF CONTENTS

### (Continued)

III.  The Decision Based on Unchangeable Offense and
      Prior Record Facts Violated Due Process Because
      the Panel Established no Nexus to Petitioner's Current
      Parole Risk to Public Safety, a Crucial Omission
      Considering that Petitioner had Served in Excess of
      the Maximum Prison Term Prescribed by the
      Regulations for a First Degree Murder with those
      Facts and Has Been Evaluated by the Board's
      Forensic Experts to Pose No Risk Whatsoever to
      Public Safety if Paroled                                        16

IV.   Interminable Preclusion of Parole Based on Petitioner's
      Conviction of Murder and Prior Record Denies Due
      Process; Because Neither Those Facts nor Petitioner's
      Negligible Parole Risk to Public Safety can Further
      Improve, and Because he has Served in Excess of the
      Maximum Prison Term Prescribed by the Regulations
      for a First Degree Murder with Those Facts, Denial of
      Parole on that Basis is Necessarily Interminable and
      has Impermissibly Converted his Prison Term to Life
      With No possibility of Parole                                   19

V.    The Executive Branch's Anti-Parole Policy Including
      Its Constitution Of BPH In Violation Of Mandatory
      Law Violates Due Process                                        31

      Relief Requested                                                34

      Verification                                                    35

# TABLE OF AUTHORITIES

## Cases

*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 ............................................................... 8, 20-26, 28, 29

*Blankership v. Kane* (N.D. Cal 2007) ___ F.Supp.2d ___, 2007 WL 1113798 .................... 10, 17, 30

*Brown v. Kane* (N.D. Cal 2007) ___ F.Supp.2d ___, 2007 WL 1288448 .......................................... 25

*Greenholtz v. Inmates of Nebraska Penal & Correctional* (1979) 442 U.S. 1 ................................. 29

*In re Barker* (2007) __ Cal.App.4th __, 2007 WL 1502277 .......................................... 9, 17

*In re Brown* (1967) 67 Cal.2d 339 ........................................................................................... 8

*In re Capistran* (2003) 107 Cal.Ap.4th 1299 ........................................................................... 8

*In re Caswell* (2001) 92 Cal.App.4th 1017 .............................................................................. 8

*In re Clutchette* (1974) 39 Cal.App.3d 561 .............................................................................. 8

*In re Elkins* (2006) 144 Cal.App.4th 475 .................................................................. 9, 17, 29, 30

*In re Gray* (2007) __ Cal.App.4th __, 2007 WL 1502288 .......................................... 9, 17

*In re Lawrence* (2007) __ Cal.App.4th __, 2007 WL 1475283 ....................................... 9, 17

*In re Lee* (2006) 143 Cal.App.4th 1400 ...................................................................... 9, 17, 29

*In re McClain* (1960) 55 Cal.2d 78 ......................................................................................... 8

*In re Minnis* (1972) 7 Cal. 3d 639 ........................................................................................... 8

*In re Monzo* (1973) 33 Cal.App.3d 144 ................................................................................... 8

*In re Powell* (1988) 45 Cal.3d 894 ..................................................................................... 2, 8

*In re Ramirez* (2001) 94 Cal.App.4th 549 ........................................................................ 8, 20

*In re Rosenkrantz* (2000) 80 Cal.App.4th 409 ....................................................................... 14

*In re Rosenkrantz* (2002) 29 Cal.4th 616 .................................................................. 7, 8, 10, 20

*In re Scott* (2004) 119 Cal.App. 4th 871 ........................................................................... 14, 15

*In re Scott* (2005) 133 Cal.App. 4th 573 ................................................... 8, 9, 17, 26, 29, 30

*In re Smith* (2003) 114 Cal.App.4th 343 ............................................................................... 14

*Irons v. Carey* (9th Cir. 2007) 479 F.3d 658 ....................................................... 10, 21, 22, 23, 24

*Irons v. Warden* (E.D.Cal. 2005) 358 F.Supp.2d 936 ........................................... 25, 26, 28, 29, 31

*Johnson v. Finn* (E.D. Cal. 2006), 2006 WL 195159 ......................................................... 26, 28

# TABLE OF AUTHORITIES
(Continued)

*Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038...............................................8, 10, 17, 27

*Martin v. Marshall* (N.D. Cal. 2006) 448 F.Supp.2d 1143....................................................8, 27

*McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895.............................................................7, 27

*Rosas v. Nielsen* (9th Cir. 2005) 429 F.3d 1229 ........................................................................25

*Rosenkrantz v. Marshall* (C.D. Cal. 2006) 444 F.Supp.2d 1063 .......................................9, 10, 18, 29

*Sanchez v. Kane* (C.D. Cal. 2006) 444 F.Supp.2d 1049 .....................................................8, 25, 27

*Sass v. Cal. Board Of Prison Terms* (9th Cir. 2006) 461 F.3d 1123 .....................................21, 22, 24

*Superintendent v. Hill* (1985) 472 U.S. 445..............................................................24, 27, 29

*Thomas v. Brown* (N.D. Cal. 2006) __ F. Supp.2d__, 2006 WL 3783555...................................10, 18

*Willis v. Kane* (N.D. Cal. 2007) ___ F.Supp.2d ___, 2007 WL 1232060 ....................................9, 17

## Statutes

Pen.C. § 1508...............................................................................................................2

Pen.C. § 3041.........................................................................6, 15, 16, 18, 20, 31, 33

Pen.C. § 3041.1...........................................................................................................31

Pen.C. § 3041.2...........................................................................................................32

Pen.C. § 5075..........................................................................................................33, 34

## Regulations

15 CCR § 2000...........................................................................................................3, 8

15 CCR § 2401.....................................................................................................6, 8, 9, 18

15 CCR § 2402.................................................................................6, 8, 9, 12, 13, 14, 18

15 CCR § 2403...............................................................................................................6

15 CCR § 2406...............................................................................................................6

15 CCR § 2407...............................................................................................................6

15 CCR § 2410.........................................................................................................6, 24

## Constitutional Provisions

Cal.Const., Art.VI, § 10 ...............................................................................................2

In re ALEX JACKSON, Petition for Writ of Habeas Corpus

MICHAEL J. GUNNING
State Bar # 194881
2351 Sunset Street
Suite 170  PMB # 511
Rocklin, CA  95765
Telephone: (916) 543-6120

Counsel for Petitioner
ALEX JACKSON

CALIFORNIA COURT OF APPEAL

SECOND APPELLATE DISTRICT

| | |
|---|---|
| In re | Case No. _____ |
| ALEX JACKSON, | **PETITION FOR WRIT OF HABEAS CORPUS;** |
| Petitioner, | **MEMORANDUM OF POINTS & AUTHORITIES** |
| For Writ of Habeas Corpus. | |

Pursuant to the claims, facts, authorities, and exhibits herein, petitioner, through counsel, seeks issuance of a writ of habeas corpus directing the Board of Parole Hearings (BPH) to vacate its decision in petitioner's parole hearing conducted on December 14, 2005 (Exhibit A), to determine his prison term and a parole date in accordance with its regulations, and, if the date set has lapsed, to discharge petitioner from prison to serve the remainder of his prescribed parole term, if any, after its reduction by the time of his imprisonment in excess of the term set and any statutory or regulatory term credit to which he is entitled by law.

## HABEAS CORPUS REQUIREMENTS

### Custody

Petitioner is confined by the California Department of Corrections and Rehabilitation (CDCR) at the Correctional Training Facility, Soledad, California, Anthony Kane, Acting Warden.

### Jurisdiction and Venue

Habeas corpus is the remedy for due process violations by BPH. (*In re Powell* (1988) 45 Cal.3d 894, 903.) Petitioner was prosecuted in and will parole to Los Angeles County. (Exhibit A, p. 1.) This Court has original jurisdiction to issue the writ and venue to adjudicate the petition. (Cal. Const., Art. VI, §10; Pen.C. §1508.)

### Administrative Remedy

BPH provides no administrative remedy for review of claims contesting a parole decision.

### Superior Court Remedy

On April 13, 2007, the Los Angeles County Superior Court denied a habeas petition raising the herein claims. The lower court held that the panel's mere recitation of codified factors allegedly describing the commitment offense and prior criminal history satisfied the some evidence test (that the lower court grossly misapplied), and failed to address the majority of petitioner's constitutional claims. A copy of the superior court order is lodged as exhibit I.

## STATEMENT OF THE CASE AND FACTS
### Criminal History, Sentencing, Commitment

Petitioner had many arrests and convictions (mostly non-violent) as a juvenile and adult. (Exhibit A, pp. 15-20.) He does not contest the extent and seriousness of his criminal record prior to the commitment offenses.

Pursuant to a guilty plea to first degree felony murder, the Los Angeles County Superior Court imposed life without parole. After this Court (case no. 2 Crim. B001409) set aside the special circumstance allegation, the Los Angeles Superior Court re-sentenced petitioner to 25 years-to-life plus a two-year determinate weapon enhancement. Kidnapping and robbery terms were run concurrently. (Exhibit B.)

Petitioner was committed to prison on September 20, 1983. His minimum eligible parole date (MEPD)[1] lapsed on December 19, *1998*. (Exhibit A, p. 1.)

### Facts of the Commitment Offense

On November 24, 1981, petitioner and codefendant Gray, armed, went to Barbara Martin's (a known drug dealer) a "dope pad" where several people were getting 'high," to steal drugs and money. Upon entering, they forced the victims into the bedroom and made them lie on the floor after demanding to know where their drugs and money were. When petitioner left the room to get the loot, Gray opened fire, killing Fletcher, and injuring Martin, Floyd, and McElroy. Martin and McElroy testified that they had

---

[1] The "minimum eligible parole date" (MEPD) is defined in the regulations as "the earliest date on which an ISL or life prisoner may legally be released on parole." (15 CCR § 2000(b)(67).)

been shot by Gray after they heard petitioner tell Gray there was to be "no shooting." The perpetrators took about one ounce of cocaine and $2,400 cash, which they split. Petitioner disposed of his gun, which had not been fired. The Court acknowledged that Gray, not petitioner, harbored the intent to kill, and that petitioner was not the shooter. (Exhibit A, pp. 10-15; exhibit D, pp. 1-2; exhibit F, p. 4; exhibit G, p. 4; exhibit H, p. 2.)

### Petitioner's Post-conviction Record

Petitioner received three disciplinary violations during his first four years in prison. He has maintained an exemplary record since 1987, receiving one (non-serious) infraction in 2000 for using another inmate's privilege card. (Exhibit A, p. 46.) He has completed all applicable therapy and self-help programming available, including NA, 12-Steps, AA, the Dry-and-Sober Program, Anger Management, the Impact Program, Distance Learning, Training in Non-Violence. He has obtained his GED, completed numerous college courses with high grades, become State-certified in Dry Cleaning, and trained as a maintenance engineer. His work supervisors' reports are excellent, he has organized and contributed to charitable causes, tutored the Teaching Reading to Adults Program, and his file contains many laudatory memoranda for his work, conduct, and reform. The Board has approved his parole plans which include a residence, offers of employment, and extensive family and community support. The victim's family does not oppose his parole. See exhibit A, pp. 35-45, 52-62; exhibit D, pp. 8-25.

### Evaluation of Petitioner's Parole Risk

Petitioner underwent an extensive psychological evaluation prior to his parole hearing, conducted by one of the Board's forensic psychologists,

Joe Reed, Ph.D. Dr. Reed confirmed that petitioner harbors sufficient remorse, has gained substantial insight into his former behavior, and poses a negligible parole risk, i.e.:

> If released to the community, his violence potential is considered to be *no more than that of the average citizen in the community*." (Exhibit C, p. 6; emphasis added.)

Dr. Reed further explained:

> There are no significant risk factors which may be precursors to violence for this individual. (Ibid.)

In petitioner's correctional evaluation, His Counselor, the Supervising Counselor, the Facility Captain, and the Parole Representative, concluded:

> Jackson . . . has a multitude of family waiting to help and has skills on which to rely for employment. Although Jackson's past is colorful to say the least, he displays an enlightened maturity and emotional stability which depicts him, as a far different individual than when his incarceration began. On an overall scale, his disciplinary history was relatively minor in nature. I do feel that Jackson will succeed upon release and exhibit the necessary intelligence and common sense in his post release decisions to keep from derailing. (Exhibit D, p. 6.)

## Petitioner's Minimum and Maximum Prescribed Prison Terms

When petitioner was finally committed to prison, he had been awarded a total of 2259 days of pre-sentencing term credits for his time in jail custody. (Exhibit B.) He became eligible to parole on his MEPD of December 19, 1998. (Exhibit A, p. 1.) The maximum prison term prescribed by BPH regulations for the particular facts of petitioner's first

degree murder and other offenses was *22 years, 8 months*, which he fully served by *May 1, 2006.*[2]

### Parole Proceedings

Petitioner was denied parole by BPH panels in 1997 and 2002, based upon his offense, prior criminal record, and early prison misconduct. Accordingly, the previous hearing panels refused to set petitioner's prison term or a parole date.[3]

On December 14, 2005, despite meeting all parole requirements and having achieved maximum parole suitability under the regulations, petitioner was again denied parole by another BPH hearing panel based *solely* on his commitment offense and prior record. The panel recited its boilerplate reasons for finding him unsuitable:

> You . . . would pose an unreasonable risk of danger to society or a threat to public safety it released from prison at this time.

---

[2] The maximum base term prescribed for the first degree murder was 28 years (see 15 CCR § 2403(b), subsec. I-A (previous relationship, prisoner did not directly cause death), to which the Board would add 1 year for the weapon enhancement (15 CCR § 2406) and 6 years for the concurrent kidnapping and robbery terms (one-half of the 12-year total, per 15 CCR § 2407(b)(4)), from which the aforementioned 2259 days of pre-sentencing credits and an additional 68 months of post-conviction credit (4 months for each disciplinary-free year in prison per 15 CCR § 2410) would be deducted, resulting in a net maximum prison term of 22 years, 8 months, which lapsed on May 1, 2006.

[3] The parole statutes and regulations prescribe a two-step process: The panel first determines whether the inmate is suitable or unsuitable for parole based on a preponderance of the evidence assessing whether parole would pose "an unreasonable risk of danger" to "public safety." The panel proceeds to the second step of determining the length of the prison term and a parole date only for inmates it finds to be suitable. (Pen.C. § 3041(b); 15 CCR §§ 2401, 2402(a), (b).)

. . . the gravity of the offense [which] was carried out in an especially cruel and callous manner. It involved multiple victims . . . The offense was carried out in a dispassionate and calculated manner . . . which demonstrates an exceptionally callous disregard for human suffering. The motive for the crime was very trivial in relationship to the offense . . .

. . . You had incurred a very, very lengthy, lengthy criminal history dating back to the age of 13. (Exhibit A, pp. 83-84.)

Accordingly, the panel found petitioner unsuitable for parole for the third time since he became eligible to parole *eight years* earlier, based solely on its recitation of codified factors of his commitment offense and his prior criminal record.

In an allegedly "separate" decision, the panel deferred petitioner's subsequent hearing for three years (two years more than the standard one-year denial) based on the fact that "you have been convicted of murder first," and a re-recitation of most of the same grounds it recited moments before for its unsuitability finding. (Exhibit A, p. 86.)

## REQUIREMENTS OF DUE PROCESS; STANDARD OF REVIEW

1. California parole law provides inmates a liberty interest in parole protected by due process. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 621 [*Rosenkrantz*]; *McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895, 901-903 [*McQuillion*].)

2. Petitioner's protected liberty interest required his being granted parole because he has been eligible to parole since *1998* and has been evaluated to pose no risk to public safety whatsoever (*"no more than that of*

*the average citizen in the community*"), far below the State's "unreasonable risk of danger" parole suitability determinant. (15 CCR §§ 2401, 2402(a).)

3. Due process required the findings supporting petitioner's parole decision to be based on a weighing of all relevant, reliable evidence in the record. (*In re Minnis* (1972) 7 Cal. 3d 639, 646; *In re Ramirez* (2001) 94 Cal.App.4th 549, 569-572; see *Rosenkrantz,* 29 Cal.4th at p. 655; 15 CCR § 2402(b)), using the *preponderance of the evidence* standard.[4]

4. Parole denial based solely on some evidence of an egregious commitment offense may violate due process if the panel did not duly consider and weigh in its decision *all* of the evidence in the record favoring parole suitability. (*In re Scott* (2005) 133 Cal.App.4th 573, 594 et seq.; see 15 CCR § 2402(b); *In re Minnis, supra,* 7 Cal. 3d at 646; *In re Capistran* (2003) 107 Cal.App.4th 1299, 1306.)

5. Although a prisoner like petitioner who qualifies for parole may initially be found unsuitable if the commitment offense was particularly egregious compared to other instances of the offense, such cases are *exceptions*, and commitment offenses cannot justify *repeated* or *interminable* parole denials. (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916 [*Biggs*]; *Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp. 2d 1038, 1046-1047 amended at 448 F.Supp.2d 1143; *Sanchez v. Kane* (C.D. Cal. 2006) 444 F.Supp.2d 1049, 1062; *In re Scott* (2005) 133 Cal.App.4th 573,

---

[4] Decisions determining parole must be based on "good cause." (*In re Powell* (1988) 45 Cal.3d at p. 901; *In re Brown* (1967) 67 Cal.2d 339, 342; *In re McClain* (1960) 55 Cal.2d 78, 87; *In re Caswell* (2001) 92 Cal.App.4th 1017, 1024, 1026; *In re Clutchette* (1974) 39 Cal.App.3d 561, 565; *In re Monzo* (1973) 33 Cal.App.3d 144, 147.) The Board's regulations define good cause as "a preponderance of the evidence." (15 CCR § 2000(b)(50).)

595; see *Rosenkrantz v. Marshall* (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1080-1087.)

6. If the Board uses offense facts and other unchangeable factors to justify a finding of parole unsuitability, it must articulate some *nexus* to the State's codified standard by explaining ***how such factors make the prospective parolee a current* "*unreasonable risk of danger" to public safety*** if paroled; otherwise such offense factors do not amount to "some evidence" that granting parole would create an "unreasonable risk of danger" to public safety.  See 15 CCR §§ 2401, 2402(a); Please see *In re Scott* (2005) 133 Cal.App. 4th 573, 595 ["the commitment offense can negate suitability only if circumstances of the crime . . . rationally indicate that the offender will present an unreasonable public safety risk if released from prison"]; *In re Elkins* (2006) 144 Cal.App.4[th] 475, 496, 499 ["Thus, a governor, in reviewing a suitability determination, must remain focused not on circumstances that may be aggravating in the abstract but, rather, on facts indicating that release currently poses 'an unreasonable risk of danger to society'"]; *In re Lee*, 143 Cal.App.4[th] 1400, 1413 [". . . the board and Governor must focus their parole decisions on whether a prisoner continues to pose an unreasonable risk to public safety . . ."]; *In re Lawrence* (2007) __ Cal.App.4[th] __, 2007 WL 1475283 at *28 et seq.; *In re Gray* (2007) __ Cal.App.4[th] __, 2007 WL 1502288; *In re Barker* (2007) __ Cal.App.4[th] __, 2007 WL 1502277 at *19; see also *Willis v. Kane* (N.D. Cal. 2007) __ F.Supp.2d __, 2007 WL 1232060 at *9 ["Notwithstanding the terrible nature of the crime, the critical question the BPH was supposed to decide at the parole suitability hearing was whether 'consideration of the public safety requires a more lengthy period of incarceration for this individual' . . . Willis' 1983 crime did not did not provide sufficient evidence to find him

unsuitable for parole in 2003"]; *Martin v. Marshal* (N.D. Cal. 2006) 431
F.Supp.2d 1038, 1049; *Blankenship v. Kane* (N.D. Cal. 2007), __ F.Supp.2d
__, 2007 WL 1113798 at *10 ["... the California regulations require ...
some evidence that the prisoner poses a present danger to society ...
continued reliance over time on an unchanging factor ... the commitment
offense ... does not provide evidence of a present danger to society"];
*Thomas v. Brown* (N.D. Cal. 2006) __ F.Supp.2d __, 2006 WL 3783555 at
*6 [not some evidence that the murder shows current parole unsuitability];
*Rosenkrantz v. Marshall* (C.D. Cal. 2006), 444 F.Supp. 2d 1063, 1086 ["the
facts surrounding petitioner's crime no longer amount to 'some evidence'
supporting the conclusion that petitioner would pose an unreasonable risk of
danger if released on parole"].

7. Preclusion of parole based on the facts of a murder offense may
constitute a due process violation after a prospective parolee committed for
that offense has served in excess of the prison term imposed or prescribed by
the Board's regulations for an offense with those facts. See *Rosenkrantz*, 29
Cal.4th at 689; *Irons v. Carey* (9th Cir. 2007) 479 F.3d 658, 665.

## PETITIONER'S CONSTITUTIONAL CLAIMS

**I. Because No Evidence Supported the Panel's Finding that Petitioner's Parole Poses an "Unreasonable Risk of Danger" to Society or a Threat to Public Safety, " Denial of Parole on that Basis Violated Due Process**

The sole ground stated by the panel for finding petitioner unsuitable was its recitation of the codified criterion, stating that he poses "an unreasonable risk of danger to society or a threat to public safety if released from prison at this time." (Exhibit A, p. 83.) The panel's recitation of the code verbatim including the disjunctive, "or," not indicating which of the two clauses (or both) applied, reflects the boilerplate nature of the decision.

The two findings set forth by the panel in support of that conclusion are detailed in the following section.

Parole denial based on the "unreasonable risk" ground denied due process; it was supported by no evidence whatsoever. *All* reliable evidence before the panel that addressed petitioner's current and future dangerousness and parole risk assessed these factors to be low. No evidence assessed it to be anywhere near the panel's "unreasonable risk of danger" finding.

The only reliable evidence assessing petitioner's current dangerousness and parole risk was petitioner's forensic evaluation, in which Dr. Reed concluded that, "[i]f released to the community, his violence potential is considered to be no more than that of the average citizen in the community." (Exhibit C, p. 6.) Petitioner's correctional evaluation likewise determined his parole risk to be low. (Exhibit D, p. 6.)

Because petitioner's record consistently establishes his low parole risk and *no* evidence addressing that factor supported the panel's finding of "unreasonable" risk, finding petitioner to be unsuitable for, and denying parole on that basis abrogated due process.

## II. Because the Two Findings Stated by the Panel for its Unreasonable Risk Ground Were Supported by No Evidence, Inapposite to the Record, and/or Irrelevant to Parole Determination, Parole Denial on that Basis Violated Due Process

### 1. Prior Criminal Convictions

The panel stated as its second finding:

> . . . You had incurred a very, very lengthy, lengthy criminal history dating back to the age of 13. (Exhibit A, p. 84.)

The unsuitability factor utilized by the panel is defined:

> "Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim . . ." (15 CCR § 2402(c)(2).)

Petitioner suffered several juvenile and adult convictions, only two of which could be considered "violent," an armed robbery as an adult, and an attempted rape when he was 17 years old involving a female 3½ years younger than he. See exhibit D, pp. 3-4.

Although petitioner's criminal record prior to the commitment offense was extensive, it did not fit the codified criterion for unsuitability because it was largely non-violent, nor did the panel cite any evidence establishing a nexus to his current parole risk. Considering the forensic evaluator's conclusion that petitioner has fully reformed from his earlier misconduct and poses no risk for violence beyond that of "the average citizen," the omissions were crucial and abrogated due process.

## 2. The Commitment Offense

The panel's remaining finding in support of its "unreasonable risk" ground was its recitation of codified factors depicting the commitment offense of first degree murder, specifically:

> . . . [the offense] was carried out in an especially cruel and callous manner.
>
> It involved multiple victims . . .
>
> . . . [the offense] was carried out in a dispassionate and calculated manner . . .
>
> . . . which demonstrates an exceptionally callous disregard for human suffering.
>
> The motive for the crime was very trivial in relationship to the offense . . . (Exhibit A, p. 83.)

The panel thus recited verbatim all five of the codified factors listed under 15 CCR § 2402(c) for first degree murders that are "especially heinous, atrocious, or cruel." Because petitioner's life offense, a fairly typical first degree murder, whether considered in the abstract or compared to other first degree murders, and particularly his role in it, neither planning nor condoning a murder nor being the shooter, was certainly not "especially heinous, atrocious, or cruel," the factors recited by the panel as examples of such a crime, were inapplicable.

The panel cited no evidence whatsoever that petitioner's actions were "especially cruel and callous" for a first degree murder, that the offense was "dispassionate and calculated" (it was conceded that the intent was not to kill, but to rob the victim), or that petitioner displayed "exceptionally callous disregard for human suffering." The witnesses and trial court acknowledged

that petitioner advised Gray there was to be "no shooting," and that only Gray harbored an intent to kill and fired the shots. See exhibit F, p. 4; exhibit G, p. 4; exhibit H, p. 2.

Our courts have repeatedly chastised BPH for its panels' repetitious, baseless recitation of these offense factors to support every finding of parole unsuitability. In *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, rev. den., the court found that no evidence supported the panel's finding that Rosenkrantz displayed "an exceptionally callous disregard for human suffering." (*Id.*, p. 425); see *In re Smith* (2003) 114 Cal.App.4th 343, 367 [no evidence that Smith acted with the requisite "cold, calculated dispassion"].)

In *In re Scott* (2004) 119 Cal.App.4th 871, 891, the court noted that "all murders involve some callousness, i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feeling and suffering of others"; to demonstrate an "exceptionally callous disregard for human suffering" the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of murder.

The further codified "exceptionally callous disregard for human suffering" factor applies by definition to murders akin to "execution-style killing(s)" (15 CCR § 2402(c)(1)(B), a category inapplicable to petitioner's offense.

The "very trivial" motive sub-factor recited by the panel was inapplicable because (1) any motive is trivial for a first degree murder, and (2) the established motive for the offense, to steal drugs and money, although it can never justify or excuse such an offense, was not at all "very trivial." As the Court of Appeal recently explained:

. . . The offense committed by most prisoners serving life terms is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed "trivial." The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must "normally" be given release dates when they approach their minimum eligible parole dates. (Pen.Code § 3041, subd. (a).) The governing statute also states that the Board shall set a release date

"unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen.Code § 3041, subd. (b).) This language means a "more lengthy period of incarceration" is called for where the gravity of the offense or offenses of the prisoner in question is more indicative of a danger to the public if the prisoner is released than would ordinarily be the case.

(*In re Scott* (2004) 119 Cal.App.4[th] 871, 892-894.)

Finally, while petitioner concedes that the offense had multiple victims, a fact he can never change, his personal role in the offenses was minimal: he allegedly kicked one of the victims but did not commit, attempt to commit, or contemplate murder or physical injury.

Because the panel failed to consider or mention petitioner's role in the offense (case law for offender as well as crime) and, more importantly, because the first degree murder was not in the oft-used "heinous, atrocious, and cruel" category for that offense needed to qualify for the sub-factors

recited, the panel's use of the criteria to deny parole abrogated due process and petitioner's protected liberty interest in parole.

### III. The Decision Based on Unchangeable Offense and Prior Record Facts Violated Due Process Because the Panel Established no Nexus to Petitioner's Current Parole Risk to Public Safety, a Crucial Omission Considering that Petitioner had Served in Excess of the Maximum Prison Term Prescribed by the Regulations for a First Degree Murder with those Facts and Has Been Evaluated by the Board's Forensic Experts to Pose No Risk Whatsoever to Public Safety if Paroled

The statute requires that parole "shall normally" be granted (Pen.C § 3041(a)), *unless* "the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that a consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Subd. (b).) The statute and a prospective parolee's protected liberty interest in parole thus require more than what the BPH panel did – recite commitment offense and prior history facts to *presume* a current parole risk to public safety. The "some evidence" test requires a reviewing court to find that the panel articulated a *nexus* between those facts and the State's parole suitability determinant – the risk to public safety currently posed by petitioner's parole.

The unambiguous language of the statute, that parole "shall normally" be granted "unless" either the "timing" or "gravity" of the commitment offenses *translates to* a current public safety risk, clearly required at least a minimal *nexus* between the offense facts alleged and petitioner's *current* parole risk. Such a nexus may be established, e.g., if an offense was caused

by or related to alcohol, drugs, gangs, or other factors that the inmate's prison record or forensic evaluations indicate may still be a public safety concern. A recitation of codified verbiage about the commitment offense to imply that public safety *therefore* requires petitioner's continued imprisonment (forever – the offense can never change) is not a decision based on some or any evidence, but on a mere *presumption*.

The following recent decisions so hold: *In re Scott* (2005) 133 Cal.App. 4th 573, 595 ["the commitment offense can negate suitability *only if circumstances of the crime . . . rationally indicate that the offender will present an unreasonable public safety risk if released from prison*"]; *In re Elkins* (2006) 144 Cal.App.4[th] 475, 496, 499 (2006) ["Thus, a governor, in reviewing a suitability determination, must remain focused not on circumstances that may be aggravating in the abstract but, rather, on *facts indicating that release currently poses 'an unreasonable risk of danger to society'*"]; *In re Lee*, 143 Cal.App.4[th] 1400, 1413 [". . . the board and Governor must focus their parole decisions on whether a prisoner continues to pose an unreasonable risk to public safety . . ."]; *In re Lawrence* (2007) __ Cal.App.4[th] __, 2007 WL 1475283 at *28 et seq.; *In re Gray* (2007) __ Cal.App.4[th] __, 2007 WL 1502288; *In re Barker* (2007) __ Cal.App.4[th] __, 2007 WL 1502277 at *19; see also *Willis v. Kane* (N.D. Cal. 2007) __ F.Supp.2d __, 2007 WL 1232060 at *9 ["*Notwithstanding the terrible nature of the crime, the critical question the BPH was supposed to decide at the parole suitability hearing was whether 'consideration of the public safety requires a more lengthy period of incarceration for this individual' . . . Willis' 1983 crime did not did not provide sufficient evidence to find him unsuitable for parole in 2003*"]; *Martin v. Marshal* (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1049; *Blankenship v. Kane* (N.D. Cal. 2007), __ F.Supp.2d

___, 2007 WL 1113798, at *10 ["... the California regulations require ... *some evidence that the prisoner poses a present danger to society* ... continued reliance over time on an unchanging factor ... *the commitment offense ... does not provide evidence of a present danger to society*"]; *Thomas v. Brown* (N.D. Cal. 2006) ___ F.Supp.2d ___, 2006 WL 3783555, at *6 [not some evidence that the murder shows current parole unsuitability]; *Rosenkrantz v. Marshall* (C.D. Cal. 2006), 444 F.Supp. 2d 1063, 1086 ["*the facts surrounding petitioner's crime no longer amount to 'some evidence' supporting the conclusion that petitioner would pose an unreasonable risk of danger if released on parole*"]. Importantly, the *Rosenkrantz* and *Lee* cases originated in this Court; Lee was released by the Court after remand from the California Supreme Court.

As those recent state and federal decisions have verified, due process and the parole scheme (Pen.C § 3041; 15 CCR §§ 2401-2402(a)) require articulation of a nexus between the offense facts recited and a petitioner's current parole risk. If parole does not pose a current "unreasonable risk of danger" to public safety, parole *must* be granted. *Id.*

Accordingly, the Court, in applying the some evidence standard in reviewing a decision by BPH should initially ask – "Some evidence of WHAT"? The state and federal cases cited above require a finding – *not* of some evidence of egregious facts of commitment offenses – but some relevant reliable evidence that those facts – or any other factors recited by a BPH panel or Governor – *make the prospective parolee a current "unreasonable risk of danger" to public safety* (all murderers were public safety risks at the time of their offenses), the suitability determinant. *Id.*

Stated differently, the some evidence standard can be satisfied only if the Court finds some relevant, reliable evidence in the record before the

panel – the commitment offense facts or any other factors used to deny parole – demonstrating that petitioner *continues to pose an unreasonable risk of danger to public safety.* Petitioner respectfully suggests that the Court will find that no such evidence exists. Accordingly, because the panel was unable to suggest that the commitment offense and prior record facts it dutifully recited had any bearing on petitioner's current parole risk to public safety, the panel's decision flunks the some evidence standard of review.

## IV. Interminable Preclusion of Parole Based on Petitioner's Conviction of Murder and Prior Record Denies Due Process; Because Neither Those Facts nor Petitioner's Negligble Parole Risk to Public Safety can Further Improve, and Because he has Served in Excess of the Maximum Prison Term Prescribed by the Regulations for a First Degree Murder with Those Facts, Denial of Parole on that Basis is Necessarily Interminable and has Impermissibly Converted his Prison Term to Life With No possibility of Parole

The authorities cited at pp. 7-10 that permit parole denial to an otherwise qualified prisoner whose commitment offense conduct was particularly egregious when compared with others who commit the offense, place reasonable limits on such discretion to preclude repeated or interminable denial of parole on that basis. Because the facts and circumstances of commitment offenses can never change, a contrary policy would convert sentences like petitioner's 25-years-to-life with the possibility of parole, to life without the possibility of parole. As the California Supreme Court has explained:

> [T]he Legislature has clearly expressed its intent
> that when murderers—who are the great majority
> of indeterminate sentences—approach their
> minimum eligible parole date, the Board "shall
> normally set a parole release date." (Pen.C. § 3041,
> subd. (a).)  The Board's authority to make an
> exception based on the gravity of a life term
> inmate's current or past offenses should not
> operate so as to swallow the rule that parole is
> "normally" to be granted . . . (*Rosenkrantz*, 29
> Cal.4th at p. 683, citing *In re Ramirez* (2000) 94
> Cal.App.4th 549, 570.)

The Ninth Circuit reviewed the constitutional propriety of a BPH

panel's use of a first degree murder commitment offense to find a prisoner

unsuitable for parole at his <u>first</u> hearing.  The Court found no evidence to

support most of the panel's grounds for unsuitability, but held that a

particularly egregious commitment offense could be an appropriate basis for

finding such a prisoner unsuitable for parole at an *initial* parole hearing.  The

Ninth Circuit cautioned:

> As in the present instance, the parole board's sole supportable
> reliance on the gravity of the offense and conduct prior to
> imprisonment to justify denial of parole can be initially justified
> as fulfilling the requirements set forth by state law.  Over time,
> however, should Biggs continue to demonstrate exemplary
> behavior and evidence of rehabilitation, denying him a parole
> date simply because of the nature of Biggs' offense and prior
> conduct would raise serious questions involving his liberty
> interest in parole…
> A continued reliance in the future on an unchanging factor, the
> circumstances of the offense and conduct prior to
> imprisonment, runs contrary to the rehabilitative goals espoused
> by the prison system and could result in a due process violation.
>
> (*Biggs, supra*, 334 F.3d at 916-917.)

*Biggs*' holding has been relied on in addressing the issue here raised by petitioner, in decisions by the State's courts and by the United States District Courts in California and the Ninth Circuit Court of Appeals.

*Irons v. Carey* (9th Cir. 2007) 479 F.3d 658 is the Ninth Circuit's third in a trilogy that includes *Biggs,* and *Sass v. California Board of Prison Terms* (9th Cir. 2006) 461 F.3d 1123 ("*Sass*"). In *Biggs, Sass, and Irons*, the Ninth Circuit adjudicated one of petitioner's pivotal claims: whether, consistent with due process, the unchanging facts of commitment offenses may be employed repeatedly or interminably to preclude the parole of one like petitioner who indisputably satisfies all parole requirements who is forensically evaluated to pose a low parole risk, and who has served in excess of the appropriate or maximum prison term prescribed by the regulations for an offense with those facts.

In *Irons* the Ninth Circuit held that the BPH panel's use of Irons' crime, a particularly egregious murder, *before he had served the minimum prison term imposed by the trial court*, satisfied the "some evidence" test sufficiently to uphold the BPH panel's decision finding that Irons was unsuitable for parole.   The court first focused on Irons' egregious murder; he fired 12 rounds into the victim, then, when he found the victim was still alive, stabbed him twice. After leaving the corpse in a sleeping bag for 10 days, Irons removed and weighted it, and dropped it in the ocean.

The Ninth Circuit then emphasized that Irons, like Sass and Biggs before him, had not served his minimum term, i.e., "the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board."   In discussing *Biggs, Sass*, and *Irons*, the Court carefully noted that while each decision must rest on its own facts, neither

Biggs, Sass, nor Irons had served their aforementioned "minimum" terms when the Board denied parole.

In *Irons* the Court explained why *Biggs* is still good law and was <u>not</u> overturned by *Sass*, and re-emphasized that ***continued use of commitment offense facts to find such an inmate unsuitable for parole may constitute a due process violation <u>after the minimum term has been served</u>***:

> In *Biggs*, we affirmed the district court's denial of a prisoner's petition for habeas corpus challenging the Board's determination that he was unsuitable for parole on the basis of his commitment offense. [ ] Although we held that the Board's decision was supported by "some evidence" because "[t]he murder of which Biggs was convicted involved killing a witness in a manner which exhibited callous disregard for life," we made clear that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.
>
> . . . Specifically, we held that a parole board's sole ... reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole. []
>
> Subsequently, in *Sass*, we held that denying parole to an individual in reliance on his offense of commitment did not violate due process. [] Although we acknowledged that *Biggs* represents the law of this circuit and specifically noted that "continued reliance ... [on] the offense and on conduct prior to imprisonment ... could result in a due process violation,' " *id.*, we nonetheless held that the Board's reliance on the "gravity" of the second degree murder of which Sass was convicted, in combination with prior incidents of unlawful conduct, provided

a sufficient basis for the Board to deem Sass unsuitable for parole.

Because the murder Sass committed was less callous and cruel than the one committed by Irons, and because Sass was likewise denied parole in spite of exemplary conduct in prison and evidence of rehabilitation, our decision in *Sass* precludes us from accepting Iron's due process argument or otherwise affirming the district court's grant of relief. *We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence.* Specifically, *in Biggs, Sass, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board.* [] All we held in those cases and all we hold today, therefore, is that, *given the particular circumstances of the offenses in these cases*, due process was not violated when these prisoners were deemed unsuitable for parole *prior to the expiration of their minimum terms.*

Furthermore, we note that in *Sass* and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole. *We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes. Biggs,* 334 F.3d at 917.

(*Irons v. Carey, supra*, at pp. 664-665, emphasis added).

Applying the standard set forth in *Irons*, petitioner has now served approximately six years in excess of his minimum 25-year prison term (including more than six years of pre-sentence term credit and good conduct term credit to which he is entitled (15 CCR § 2410).)

In a recent California district court case involving a potential parolee committed for murder, the court reasoned:

> Another critical difference between this case and *Biggs, Sass* and *Irons* is that Brown has served a substantial amount of time beyond his minimum sentence. This court must consider that at some point after an inmate has served his minimum sentence the probative value of his commitment offense as an indicator of "unreasonable risk of danger to society" recedes below the "some evidence" required by due process to support a denial of parole. *See Irons*, 479 F.3d at 665. A decision to revoke parole based solely on an inmate's commitment offense that can no longer be considered probative of dangerousness to society would be arbitrary and not comport with the "some evidence" standard. *See Hill*, 472 U.S. at 545-55, 457. This is one of those cases...
>
> Petitioner's commitment offense would be a sufficient basis to deny his parole if it indicated a risk of re-offending and of a danger to society. It does not... By itself, however, Brown's exercise of poor judgment at age 22 is not probative, absent any more recent indicators, of his exercise of poor judgment again at his nearing the age of 50. Not only did the Governor and state courts fail to point to any such indicators, but Brown's ultimately positive prison record over the past two and a half decades indicates, as the BPT concluded, that he is suitable for parole.
>
> The state court's determination that the Governor's sole reliance on Brown's commitment offense satisfied the "some evidence" standard was an objectively unreasonable application of *Hill*. *See* 28 U.S.C. § 2254(d). Brown is entitled to federal habeas relief on his due process claim.

(*Brown v. Kane* (N.D. Cal. 2007) ___F.Supp.2d ___, 2007 WL
1288448 at *6-7.)

In *Sanchez v. Kane, supra*, 444 F.Supp.2d 1049, Sanchez had been
denied parole based on the gravity of his commitment offense, also a
murder. The Court affirmed Sanchez' protected liberty interest in parole.
(*Id.* at p. 1058.) After rejecting several evidentiarily unsupported grounds,
the court, in ordering Sanchez' release, addressed the claim here at issue –
the continued use of a murder commitment offense to repeatedly preclude
Sanchez' parole:

> Finally, the Governor relied upon the callous nature and
> circumstances of the crime, stating "[i]t was a planned
> calculated and cold-blooded murder demonstrating
> exceptionally callous disregard for human suffering ⋯ [and it]
> involved particularly egregious acts beyond the minimum
> necessary to sustain a conviction of second-degree murder." []
> However, as the Board recognized, the events and
> circumstances surrounding Petitioner's crime are unchanging. []
> ("I want to explain to you that no matter what happens in your
> lifetime, the crime is never going to change. You understand
> that⋯ That's always going to be there, period⋯ [T]he crime is
> never going to change⋯").

> Although the Board or Governor is "initially justified" in
> relying on the gravity of an inmate's offense in denying him
> parole, *Rosas*, 428 F.3d at 1232-33; *Biggs*, 334 F.3d at 916,
> "continued reliance ⋯ on an unchanging factor, the
> circumstances of the offense and conduct prior to
> imprisonment, runs contrary to the rehabilitation goals
> espoused by the prison system and could result in a due process
> violation." *Biggs*, 334 F.3d at 916-17; *Irons v. Warden of Cal.
> State Prison-Solano*, 358 F.Supp.2d 936, 947 (E.D.Cal.2005).

> Here, Petitioner had three prior parole suitability hearings, after
> each of which he continued to demonstrate "exemplary

behavior and evidence of rehabilitation[,]" *Biggs,* 334 F.3d at
916, before the Board found him suitable for parole. Yet,
Petitioner has consistently maintained "positive institutional
behavior" and "significant and proven self-control[,]" [] thus,
"the predictive ability of the circumstances of the crime is near
zero." *Irons,* 358 F.Supp.2d at 947 n. 2; *see also In re Scott,*
133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905, 920 ("The
commitment offense can negate suitability only if
circumstances of the crime reliably established by evidence in
the record rationally indicate that the offender will present an
unreasonable public safety risk if released from prison. Yet, the
predictive value of the commitment offense may be very
questionable after a long period of time."). Under these
circumstances, the Governor's continued reliance on the
circumstances surrounding the murder to deny Petitioner parole
violates due process of law. *Irons,* 358 F.Supp.2d at 947; *Scott,*
133 Cal.App.4th at 597-601, 34 Cal.Rptr.3d 905; *see also
Johnson,* 2006 WL 195159 at *8 ("As recognized by the
[Board,] the inhumanity of the murder will never change, it will
not minimize in its shockingness over time. A later decision
that the murder 'wasn't so bad' will never be made, and if it
were, such a decision would be clearly arbitrary.

Therefore, if the Governor's decision to deny parole based on
the nature of the offense is permitted to stand, contrary to the
parole statutes which logically measure parole eligibility on the
reformation of the prisoner after the proscribed period of
punishment, parole eligibility is an impossibility, not a
possibility. The parole statutes do not vest the Governor [or the
BPH] with the power to re-sentence Petitioner.").

. . . if the Governor's decision to deny parole based on the
nature of the offense is permitted to stand, contrary to the parole
statutes which logically measure parole eligibility on the
reformation of the prisoner after the proscribed period of
punishment, parole eligibility is an impossibility, not a
possibility. The parole statutes do not vest the Governor with
the power to re-sentence Petitioner.").
For the reasons stated herein, the Court finds the Governor's
reversal of the Board's grant of parole to Petitioner is not

supported by "some evidence" in the record, *Hill, 472 U.S.*
*455-56, 105 S.Ct. at 2774*; *McQuillion, 306 F.3d at 912*; thus,
Petitioner was denied due process.

(*Sanchez v. Kane, supra*, 444 F.Supp.2d at 1061-1062.)


In another recent decision, *Martin v. Marshall* (N.D. Cal. 2006) 431
F.Supp.2d 1038, the district court re-affirmed the principles of *Biggs* and its
progeny in vacating a decision denying parole in a murder case. Unlike
petitioner, Martin's parole risk was <u>moderate</u>, and he had committed <u>twenty</u>
disciplinary infractions. In ordering the petitioner's release, the court
explained that "because Petitioner cannot change the past," repeated denials
of parole based on outdated static factors impermissibly converted Martin's
prison term to life without the possibility of parole. Please see the court's
amended judgment in *Martin v. Marshall*, 448 F.Supp.2d 1143.

In an even more recent decision on this issue a federal district court
ordered the release of a California life term prisoner whose commitment
offense was one of the most egregious second degree murders on record –
the defendant had purchased and practiced with an Uzi, laid in wait, shot the
victim ten times, absconded, and threatened further revenge. In reversing
the panel's decision at Rosenkrantz' fourth parole hearing and ordering his
release from prison, the district court explained:

> In the circumstances of this case, the BPT's continued reliance
> upon the nature of Petitioner's crime to deny parole [ ] violated
> due process. First, continued reliance upon the unchanging facts
> of Petitioner's crime makes a sham of California's parole system
> and amounts to an arbitrary denial of Petitioner's liberty
> interest. Petitioner had been denied parole on six occasions
> prior to the determination he now challenges. Continued
> reliance upon the unchanging characterization of Petitioner's

offense amounts to converting Petitioner's sentence of seventeen years to life to a term of life without the possibility of parole. [ ]

Second, in this case, the circumstances of Petitioner's crime do not amount to some evidence supporting the conclusion that Petitioner poses an unreasonable risk of danger if released. As discussed, "[i]n the parole context, the requirements of due process are met if some evidence supports the decision." Significantly, the evidence underlying the decision must be supported by "some indicia of reliability." _Biggs_, 334 F.3d at 914 (internal quotations omitted)[.]  Otherwise, it does not constitute "some evidence." [ ]

While relying upon Petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances - after nearly two decades of incarceration and half a dozen parole suitability hearings-violates due process because Petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some evidence" standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil. _See Johnson v. Finn_, 2006 WL 195159 at p. 8 n. 3 (E.D.Cal.2006) (stating that "the seriousness of the crime had predictive value for the dangerousness of Petitioner's release for the first, second, perhaps third suitability hearing. But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming Petitioner's record in prison is exemplary)."); _Irons_, 358 F.Supp.2d at 947 n. 2.

Petitioner's case is exactly what _Biggs_ envisioned when it stated that repeated refusals to grant a parole release date to an inmate with an exemplary post-conviction record may violate the prisoner's due process rights. _Biggs_, 334 F.3d at 919. The record is replete with evidence of Petitioner's remorse and rehabilitation, including glowingly positive psychological reports, extensive self-improvement through educational and

vocational advancements as well as therapy, valued service in promoting the penological goals of the prison, and nearly two decades of disciplinary-free incarceration. The evidence of Petitioner's outstanding performance while incarcerated is particularly significant. As the Supreme Court has recognized, "[t]he behavior of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release." *Greenholtz, 442 U.S. at 15*. Regardless of whether the BPT ever was entitled to rely upon the commitment offense to find that this particular Petitioner posed an unreasonable risk of danger and was unsuitable for parole, under these unusual circumstances, the BPT's continued reliance on the commitment offense violates due process because it resulted in an arbitrary decision and because the facts surrounding the offense do not now constitute "some evidence" with "some indicia of reliability" of Petitioner's dangerousness. *See Hill, 472 U.S. at 455; Biggs, 334 F.3d at 917; Irons, 358 F.Supp.2d at 947[.]*

(*Rosenkrantz v. Marshall, supra,* 444 F.Supp.2d at 1083-1087.)

California courts have ruled identically on the issue in ordering the release of inmates committed for life offenses. See *In re Scott, supra,* at p. 595, and the later decision in *In re Lee, supra* at 1413. More recently in *In re Elkins, supra,* 144 Cal.App.4[th] 475, the Court of Appeal, in a published decision in a first degree murder case held, in ordering the prisoner's release on parole:

Given the lapse of [many] years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating facts of the crime no longer amount to "some evidence" supporting denial of parole.

[Note: Elkins' sentence was also 25 years-to-life.]

The commitment offense, this court has observed, is an unsuitability factor that is immutable and whose predictive value "may be very questionable after a long period of time

[citation]." ( *Scott II, supra,* 133 Cal.App.4th at pp. 594-595, fn. omitted.) We have also noted, as has our Supreme Court, strong legal and scientific support that "predictions of future dangerousness are exceedingly unreliable," even where the passage of time is not a factor and the assessment is made by an expert. ( *Id.* at p. 595, fn. 9.) Reliance on an immutable factor, without regard to or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative goals espoused by the prison system, and result in a due process violation. ( *Id.* at p. 595.)

[Court reviews authorities, mostly those herein, and orders Elkins' release on parole forthwith.]

(*In re Elkins, supra,* 144 Cal.App.4th 475, 499.)

In another murder case, a district court just recently concluded:

[T]he California regulations require the Board to find some evidence that the prisoner poses a present danger to society. A continued reliance over time on an unchanging factor, such as the commitment offense and past substance abuse, does not provide evidence of a present danger to society and thus may rise to the level of a due process violation. Reliance on unchanging factors ***transforms an offense for which California law-and the sentencing judge-provided parole eligibility into an offense carrying life imprisonment without the possibility of parole.***

(*Blankenship v. Kane, supra,* at *10; emphasis added.)

Petitioner, a 50-year-old, fully reformed, rehabilitated, parole-qualified citizen, having achieved the maximum parole suitability possible under BPH's regulations and the suitability factors listed therein, was eligible to parole *8½ years ago* on his MEPD of December 19, *1998.* The *maximum* prison term prescribed for the facts of his offense has long lapsed.

In re ALEX JACKSON, Petition for Writ of Habeas Corpus; P & As – Page 30

See p. 6, fn. 2. Yet, BPH continues to preclude his parole based on those facts, which, like his parole suitability otherwise, cannot further improve, modifying his legislatively-prescribed prison term, 25 years-to-life with the possibility of parole, which Pen.C. § 3041(a) defines as a *probability* of parole (panel "shall normally set a parole release date"), to life with *no* possibility of parole. That result is particularly egregious because petitioner did not kill, attempt to kill, or intend to kill, and he has been evaluated by BPH's forensic staff to pose a risk to public safety commensurate with that of "the average citizen."

Absent judicial intervention, petitioner's parole will *always* be precluded because he cannot change the factors on which its denial is based – unless, as the district court reasoned in *Irons*, some future panel arbitrarily decides that the previous panels were wrong or the factors do not apply. (358 F.Supp.2d at pp. 946-947.) Basing petitioner's possibility of parole on such a whim is a result prohibited by the above-cited authorities, the State's parole laws, and the Due Process Clauses.

## V. The Executive Branch's Anti-Parole Policy Including its Constitution of BPH in Violation of Mandatory Law Violates Due Process

### A. The Anti-Parole Policy is Arbitrary and Contrary to Law

The anti-parole policy was initiated by former Governor Pete Wilson who, toward the end of his second term in the late 1990's, following an incident in which Willie Horton, a convicted murderer in Massachusetts, committed a rape while on furlough that impacted the presidential campaign of Senator Dukakis. Using Pen.C. § 3041.1, Governor Wilson referred all

cases of indeterminately sentenced prisoners (lifers), who had been granted parole but not yet paroled, to BPH, which rescinded nearly all of the paroles by deeming them to have been "improvidently" granted. Most of those inmates are still imprisoned or have died.

On April 9, 1999, Governor Davis publicly proclaimed that he would exercise his authority under Pen.C. § 3041.2 to preclude the parole of all inmates who had been convicted of murder; he stated there would be "no exceptions – none." Pursuant to that policy, only six paroles granted to such prisoners (in over 8,000 hearings) were allowed to parole over the ensuing five-year period.[5]

After Davis was deposed by the voters, Governor Schwarzenegger's staff (the Governor is not involved in the process except to sign or authorize a staff member to sign the decisions) has continued the policy to a slightly lesser extent, reversing approximately 72% of the very few paroles granted by BPH in murder cases.[6]

According to statistics issued by BPH on March 8, 2006, in 2005 BPH conducted hearings for 2,788 inmates whose commitment offense was murder, of which 152 (5.5%) were "granted" parole. Most of those "grants" were disapproved by BPH review staff or reversed by the Governor, allowing only thirty-one to parole.

Thus, only 1.1% of parole hearings for prisoners serving indeterminate sentences for murder results in an actual parole – compared to

---

[5] Petitioner will submit, on the Court's request, these statistics obtained from the Governors' office, BPH, and other sources.

[6] This figure has increased recently to 90 percent, although current formal figures are not available.

In re ALEX JACKSON, Petition for Writ of Habeas Corpus; P & As – Page 32

the parole statute's mandatory requirement that parole should "normally" be granted to such inmates at their initial hearings. (Pen.C. § 3041(a).)

Petitioner respectfully refers the Court to exhibit E, a decision in *Coleman v. Board of Prison Terms, et al.* (E.D. Cal. 2005), case No. 96-0783, including evidence re-affirming existence of California's anti-parole policy.

### B. The Parole Determination Process Violates Due Process; It is Inherently Biased Against Parole Because BPH and its Panels' Constituency is Contrary to Statute

Penal Code § 5075 requires in pertinent part:

> "The selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross-section of the racial, sexual, economic, and geographic features of the population of the state."

Of the last thirty-four new commissioners appointed by governors, thirty-one were former law enforcement personnel (who helped to incarcerate the individuals they now judge by arresting and testifying against them), anti-parole Legislators (who passed laws to keep such inmates imprisoned longer), and/or crime victim advocates (whose sole proclaimed goal is to prevent all such paroles). The appointment of such biased commissioners is contrary to the statute's requirements. At the time of petitioner's hearing, all commissioners (except those "inherited" from the Youth Authority and Narcotics Boards when they merged with BPH) were in those categories. BPH has no commissioners from the State's lower or

lower-middle economic strata or from the State's largest industries (farming, labor); only one commissioner is from the State's smallest thirty counties. Importantly, BPH, unlike other States' parole boards, has no members with training or qualification to determine parole. There are no former judges, public defenders, non-government lawyers, psychologists, psychiatrists, educators, or clergy. All are strictly political appointees to promote the governors' publicly proclaimed anti-parole mandate.

It would be practically impossible to constitute a parole board not inherently biased against petitioner and his parole. BPH's constituency violates the intent and the mandatory ("shall") language of Pen.C. § 5075, insures bias and fundamental unfairness, and violates the liberty interest and right to due process vested in petitioner by the State's parole laws protected by the Due Process Clauses of the Federal and State Constitutions.

## RELIEF REQUESTED

Petitioner respectfully seeks an order directing BPH to vacate its decision of December 14, 2005, to immediately conduct a hearing for the sole purpose of determining his prison term and a parole date in accordance with its regulations, and, if the date set has lapsed, to discharge him from prison to serve the remainder of his prescribed parole term, if any, after its reduction by the time of his imprisonment in excess of the term so set and any statutory or regulatory term credit to which petitioner is entitled by law.

Because the petition sets forth a prima facie case for relief, an order to show cause should issue directing briefing on the merits.

Date: 6-11-07

Respectfully submitted,

Michael J. Gunning
Counsel for Petitioner
Alex Jackson

## VERIFICATION

I declare, under penalty of perjury, that the facts stated above are true.

DATED this 11th day of June, 2007, at Rocklin, California.

Michael J. Gunning
Declarant

In re ALEX JACKSON, Petition for Writ of Habeas Corpus; P & As – Page 35

## TABLE OF EXHIBITS

EXHIBIT A      Certified transcript of December 14, 2005, parole hearing

EXHIBIT B      Abstract of Judgment

EXHIBIT C      Petitioner's psychological evaluation

EXHIBIT D      Petitioner's correctional evaluation

EXHIBIT E      *Coleman v. BPT* (E.D. Cal. 2005; no. 96-0783)

EXHIBIT F      Excerpts, Probation Department report for sentencing

EXHIBIT G      Certified transcript of plea hearing

EXHIBIT H      Certified transcript of sentencing hearing

EXHIBIT I      Los Angeles Superior Court order denying habeas petition

## <u>DECLARATION OF SERVICE BY MAIL</u>

Case Name:  **In re Alex Jackson** (habeas corpus)

I declare that I am a citizen of the United States.  I am over the age of 18 and am not a party to the within title cause.

On ___June  12,  2007___, I served the attached

**Petition for Writ of Habeas Corpus; Points & Authorities; Exhibits**

on the parties listed below by enclosing same in an envelope to which adequate postage was affixed, and depositing same at the United States Post Office in Walnut, California for mailing.

**Attorney General**
110 W. A Street, Suite 1100
San Diego, California 92186-5266

**Los Angeles Superior Court**
110 W. Temple Street
Los Angeles, CA  90012

I declare, under penalty of perjury, that the facts I have stated above are true and correct.

Dated ___June  12,  2007___, at Walnut, California

_Joseph Wasko_
Declarant

# EXHIBIT  C

Nov 16 07 11:20p
Nov-16-07    11:48am   From-    Case 3:08-cv-00923-MMC    Document 4-4    Filed 03/28/2008    Page 2 of 44    p.1
                                                          f-i      P.001/001   F-845

*Exh K*

Court of Appeal, Second Appellate District, Div. 5 - No. B199769
S154233

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

In re ALEX JACKSON on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

SEP 1 2 2007

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice



RECEIVED IN CRIMINAL DOCKETING
CMS

# CALIFORNIA SUPREME COURT

In re

    ALEX JACKSON,

            Petitioner,

For Writ of Habeas Corpus.

Case No. _____

CA2 No. B199769

---

## PETITION FOR REVIEW

---

MICHAEL J. GUNNING
State Bar # 194881
2351 Sunset Street
Suite 170  PMB # 511
Rocklin, CA  95765
Telephone: (916) 543-6120

Counsel for Petitioner
ALEX JACKSON

# TABLE OF CONTENTS

Page

Petition for Review ........................................... 1

Questions Presented for Review ........................ 2

Necessity for Review ........................................ 2

Statement of the Case and Facts ...................... 3

The Requirements of Due Process; Standard of Review ... 7

Petitioner's Constitutional Claims ................... 11

I.    Because no Evidence Supported the Panel's Finding that Petitioner's Parole Poses an "Unreasonable Risk of Danger to Society or a Threat to Public Safety," Denial of Parole on that Basis Violated Due Process ... 9

II.   Because the Two Findings Stated by the Panel for its Unreasonable Risk Ground Were Supported by no Evidence, Inapposite to the Record, and/or Irrelevant to Parole Determination, Parole Denial on that Basis Violated Due Process ... 10

III.  The Decision Based on Unchangeable Offense and Prior Record Facts Violated Due Process Because the Panel Established no Nexus to Petitioner's Current Parole Risk ... 14

IV.  Interminable Denial of Petitioner's Parole Based On Arguably Applicable but Unchangeable Pre-commitment Factors has Abrogated Due Process by Amending Petitioner's Prison Term to Life Without Any Possibility of Parole ... 17

PETITION FOR WRIT OF HABEAS CORPUS; In re ALEX JACKSON

# TABLE OF CONTENTS
## (Continued)

V.    The Executive Branch's Anti-Parole Policy Including
      its Constitution of BPH in Violation of Mandatory Law
      Violates Due Process                                          29


Relief Requested                                                   32

Certification of Word Count                                        33

Court of Appeal Decision                                           34

# **TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                    <u>Page Nos.</u>

*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 ...............................10, 16, 18, 22-27

*Blankenship v. Kane* (N.D. Cal. 2006) __F.Supp.2d__, 2006 WL 515627.....................20

*Carillo v. Fabian,* (2005) 701 N.W.2d 763 ..............................................................34

*Greenholtz v. Nebraska* (1979) 442 U.S. 1 .............................................................26

*In re Arafiles* (1992) 6 Cal.App.4th 1467 ...............................................................33

*In re Barker* (2007) __ Cal.App.4th __, 2007 WL 1502277 .......................................20

*In re Brown* (1967) 67 Cal.2d 339 ...........................................................................9

*In re Caswell* (2001) 92 Cal.App.4th 1017 ...............................................................9

*In re Clutchette* (1974) 39 Cal.App.3d 561 ...............................................................9

*In re Dannenberg* (2005) 34 Cal.4th 1061 ...............................................................13

*In re Dunham* (1976) 16 Cal.3d. 63...........................................................................32

*In re Elkins* (2006) 144 Cal.App.4th 475 ................................10, 14, 17, 20, 27.

*In re Gray* (2007) __ Cal.App.4th __, 2007 WL 1502288 ........................................20

*In re Lawrence* (2007) __Cal.App.4th __, 2007 WL 1475283 .............................10, 20

*In re Lee* (2006)143 Cal.App.4th 1400 ..................................10, 12-13, 17, 18, 27

*In re Mc Clain* (1960) 5 Cal.2d 78 ...........................................................................9

*In re Minnis* (1972) 7 Cal.3d 639 ..............................................................................9

*In re Monzo* (1973)33 Cal.App.3d 144 ......................................................................9

*In re Powell* (1988) 45 Cal.3d 894 ....................................................................9, 33

*In re Ramirez* (2001) 94 Cal.App.4th 549 ....................................................9, 13, 22, 33

*In re Rosenkrantz* (2002) 29 Cal. 4th 616 ....................8-10, 13, 15, 16, 22, 34

*In re Rosenkrantz* (2000) 80 Cal.App.4th 409 ............................................................32

*In re Scott* (2004) 119 Cal. App. 4th 871 .............................................................9, 13

*In re Scott* (2005) 133 Cal.App. 4th 573 ...........................10, 15, 17-21, 24, 27

*In re Smith* (2003) 114 Cal.App.4th 343 ..............................................................9, 16

*In re Stanley* (1976) 54 Cal.App.3d 1030 ................................................................32

*Irons v. Carey* (9th Cir. 2007) 479 F.3d 658 ..............................................................10

# TABLE OF AUTHORITIES

## (continued)

<u>Cases</u>                                                                  <u>Page Nos.</u>

*Irons v. Warden* (E.D. Cal. 2005) 358 F.Supp.2d 936 ................16, 18, 19, 24, 26-28

*Johnson v. Finn* (E.D. Cal. 2006) 2006WL195159...........................................19, 26

*Johnson v. Gomez* (9th Cir. 1996) 92 F.3d 964 ..............................................................33

*Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038............................10, 20, 24, 30

*Martin v. Marshall* (N.D. Cal. 2006) 448 F.Supp.2d 1143 .......................10, 25, 30

*McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895 ...................................24, 33

*Rosas v. Nielsen* (9th Cir. 2005) 429 F.3d 1229 ...........................................24

*Rosenkrantz v. Marshall* (C.D. Cal. 2006) 444 F.Supp.2d 1063 ...............10, 19, 21, 27

*Sanchez v. Kane* (C.D. Cal. 2006) 444 F.Supp.2d 1049 .........................19, 23, 24

*Sass v. Board of Prison Terms* (9th Cir. 2006) 461 F.3d 1123..................................9

*Superintendent v. Hill* (1985) 472 U.S. 445 ..........................................24, 27, 33, 34

*Thomas v. Brown* (N.D. Cal. 2006) __ F. Supp.2d __, 2006 WL 3783555..................21

*Willis v. Kane* (N.D. Cal. 2007) __ F.Supp.2d __, 2007 WL 1232060 ........................20


<u>Statutes</u>

Pen.C. § 2933.....................................................................................................6

Pen.C. § 3041...........................................................................9, 14, 20-22, 28, 30

Pen.C. § 3041.1....................................................................................................29

Pen.C. § 3041.2 .........................................................................8, 9, 29, 32

Pen.C. § 5075........................................................................................30, 31

## TABLE OF AUTHORITIES

### (continued)

<u>Regulations</u>

15 CCR § 2000................................................................................................4, 9

15 CCR § 2401............................................................................4, 9, 11, 21

15 CCR § 2402.........................................4, 9, 11, 13, 16, 17, 20, 21, 32

15 CCR § 2403......................................................................................,6

15 CCR § 2410.......................................................................................6


<u>Constitutional Provisions</u>                                    <u>Page Nos.</u>

Cal.Const., Art.V, § 8.........................................................9, 32, 33

PETITION FOR WRIT OF HABEAS CORPUS; In re ALEX JACKSON

MICHAEL J. GUNNING
State Bar # 194881
2351 Sunset Street
Suite 170  PMB # 511
Rocklin, CA  95765
Telephone: (916) 543-6120

Counsel for Petitioner
ALEX JACKSON

# SUPREME COURT OF CALIFORNIA

| | |
|---|---|
| In re | Case No._____ |
|    ALEX JACKSON, | (CA2 No. B199769) |
|                Petitioner, | **PETITION FOR REVIEW** |
| For Writ of Habeas Corpus. | |

TO THE HONORABLE RONALD M. GEORGE, Chief Justice, and

THE HONORABLE ASSOCIATE JUSTICES of the California Supreme

Court:

## PETITION FOR REVIEW

Petitioner Alex Jackson respectfully petitions the Court for review of

the decision of the Court of Appeal, Second Appellate District, filed on June

28, 2007, case No. B199769, denying the petition for writ of habeas corpus.

A copy of the opinion of the Court of Appeal to be reviewed is attached as

page 34.

## QUESTIONS PRESENTED FOR REVIEW

1. Do due process and the State's parole laws and regulations permit the Board of Parole Hearings (BPH) to deny parole based on the facts of a first-degree murder commitment offense, a homicide committed by a codefendant in which the prospective parolee played a peripheral role, after the subject has served the prison term prescribed by the Board's regulations for a first degree murder with those facts and been assessed by the Board's forensic experts to pose a risk to public safety, if paroled, "no more than the average citizen in the community," far below the State's codified "unreasonable risk of danger" standard below which parole must be granted?

2. Do due process and the State's parole laws and regulations require a BPH panel which deems a prospective parolee unsuitable for parole based on the facts of a murder commitment offense to articulate a nexus or bearing such facts have upon the subject's current parole risk to public safety, the State's codified parole suitability determinant?

## NECESSITY FOR REVIEW

Review is necessary because, since these issues, although of first impression, were not addressed by the Court in *Rosenkrantz* or *Dannenberg*, and, although (in retrospect) their determination is prerequisite to application of those two decisions, subsequent state and federal court decisions applying the Court's holdings in those cases are conflicting, thus substantially in need of review and determination to secure decisional uniformity, meaningful application of the State's parole laws and regulations to protect public safety, and due process of law.

## STATEMENT OF THE CASE AND FACTS
### Superior Court Remedy

On April 13, 2007, the Los Angeles County Superior Court denied a habeas petition. The lower court held that the panel's mere recitation of codified factors allegedly describing the commitment offense and prior criminal history satisfied the some evidence test, a test misapplied by the court to the issue of whether the offense and prior record facts existed as to their gravity, rather than to the issue of whether any relevant evidence supported *the panel's decision* that petitioner currently poses an unreasonable parole risk to public safety, the State's parole suitability determinant. A copy of the superior court order was lodged as exhibit I.

### Court of Appeal Remedy

The appellate order to be reviewed consists of one sentence stating "[t]here is some evidence to support the decision of the Board of Parole Hearings." The order does not indicate what that evidence may be or if it has any bearing upon petitioner's current parole risk. See page 34.

## STATEMENT OF THE CASE AND FACTS
### Criminal History, Sentencing, Commitment

Petitioner had many arrests and convictions (mostly non-violent) as a juvenile and adult. (Exhibit A, pp. 15-20.) He does not contest the extent and seriousness of his criminal record prior to the commitment offenses.

Pursuant to a guilty plea to first degree felony murder, the Los Angeles County Superior Court imposed life without parole. After this Court (case no. 2 Crim. B001409) set aside the special circumstance allegation, the Los Angeles Superior Court re-sentenced petitioner to 25 years-to-life plus a two-year determinate weapon enhancement. Kidnapping and robbery terms were run concurrently. (Exhibit B.)    Petitioner was

committed to prison on September 20, 1983. His minimum eligible parole
date (MEPD)[1] lapsed on December 19, *1998*. (Exhibit A, p. 1.)

### Facts of the Commitment Offense

On November 24, 1981, petitioner and codefendant Gray, armed,
went to Barbara Martin's (a known drug dealer) a "dope pad" where several
people were getting 'high," to steal drugs and money. Upon entering, they
forced the victims into the bedroom and made them lie on the floor after
demanding to know where their drugs and money were. When petitioner left
the room to get the loot, Gray opened fire, killing Fletcher, and injuring
Martin, Floyd, and McElroy. Martin and McElroy testified that they had
been shot by Gray after they heard petitioner tell Gray there was to be "no
shooting." The perpetrators took about one ounce of cocaine and $2,400
cash, which they split. Petitioner disposed of his gun, which had not been
fired. The Court acknowledged that Gray, not petitioner, harbored the intent
to kill, and that petitioner was not the shooter. (Exhibit A, pp. 10-15; exhibit
D, pp. 1-2; exhibit F, p. 4; exhibit G, p. 4; exhibit H, p. 2.)

### Petitioner's Post-conviction Record

Petitioner received three disciplinary violations during his first four
years in prison. He has maintained an exemplary record since 1987,
receiving one (non-serious) infraction in 2000 for using another inmate's
privilege card. (Exhibit A, p. 46.) He has completed all applicable therapy
and self-help programming available, including NA, 12-Steps, AA, the Dry-
and-Sober Program, Anger Management, the Impact Program, Distance
Learning, Training in Non-Violence. He has obtained his GED, completed
numerous college courses with high grades, become State-certified in Dry

---

[1] The "minimum eligible parole date" (MEPD) is defined in the regulations as "the
earliest date on which an ISL or life prisoner may legally be released on parole." (15
CCR § 2000(b)(67).)

Cleaning, and trained as a maintenance engineer. His work supervisors' reports are excellent, he has organized and contributed to charitable causes, tutored the Teaching Reading to Adults Program, and his file contains many laudatory memoranda for his work, conduct, and reform. The Board has approved his parole plans which include a residence, offers of employment, and extensive family and community support. The victim's family does not oppose his parole. See exhibit A, pp. 35-45, 52-62; exhibit D, pp. 8-25.

### Evaluation of Petitioner's Parole Risk

Petitioner underwent an extensive psychological evaluation prior to his parole hearing, conducted by one of the Board's forensic psychologists, Joe Reed, Ph.D. Dr. Reed confirmed that petitioner harbors sufficient remorse, has gained substantial insight into his former behavior, and poses a negligible parole risk, i.e.:

> If released to the community, his violence potential is considered to be *no more than that of the average citizen in the community*." (Exhibit C, p. 6; emphasis added.)

Dr. Reed further explained:

> There are no significant risk factors which may be precursors to violence for this individual. (Ibid.)

In petitioner's correctional evaluation, His Counselor, the Supervising Counselor, the Facility Captain, and the Parole Representative, concluded:

> Jackson [] has a multitude of family waiting to help and has skills on which to rely for employment. Although Jackson's past is colorful to say the least, he displays an enlightened maturity and emotional stability which depicts him, as a far different individual than when his incarceration began. On an overall scale, his disciplinary history was relatively minor in nature. I do feel that Jackson will succeed upon release and exhibit the necessary intelligence and common sense in his post release decisions to keep from derailing. (Exhibit D, p. 6.)

PETITION FOR REVIEW; In re ALEX JACKSON — Page 5

### Petitioner's Minimum and Maximum Prescribed Prison Terms

When petitioner was finally committed to prison, he had been awarded a total of 2259 days of pre-sentencing term credits for his time in jail custody. (Exhibit B.) He became eligible to parole on his MEPD of December 19, 1998. (Exhibit A, p. 1.) The maximum prison term prescribed by BPH regulations for the particular facts of petitioner's first degree murder and other offenses was *22 years, 8 months*, which he fully served by *May 1, 2006.*[2]

### Parole Proceedings

Petitioner was denied parole by BPH panels in 1997 and 2002, based upon his offense, prior criminal record, and early prison misconduct. Accordingly, the previous hearing panels refused to set petitioner's prison term or a parole date.[3]

On December 14, 2005, despite meeting all parole requirements and having achieved maximum parole suitability under the regulations, petitioner was again denied parole by another BPH hearing panel based *solely* on his

---

[2] The maximum base term prescribed for the first degree murder was 28 years (see 15 CCR § 2403(b), subsec. I-A (previous relationship, prisoner did not directly cause death), to which the Board would add 1 year for the weapon enhancement (15 CCR § 2406) and 6 years for the concurrent kidnapping and robbery terms (one-half of the 12-year total, per 15 CCR § 2407(b)(4)), from which the aforementioned 2259 days of pre-sentencing credits and an additional 68 months of post-conviction credit (4 months for each disciplinary-free year in prison per 15 CCR § 2410) would be deducted, resulting in a net maximum prison term of 22 years, 8 months, which lapsed on May 1, 2006.

[3] The parole statutes and regulations prescribe a two-step process: The panel first determines whether the inmate is suitable or unsuitable for parole based on a preponderance of the evidence assessing whether parole would pose "an unreasonable risk of danger" to "public safety." The panel proceeds to the second step of determining the length of the prison term and a parole date only for inmates it finds to be suitable. (Pen.C. § 3041(b); 15 CCR §§ 2401, 2402(a), (b).)

commitment offense and prior record. The panel recited its boilerplate reasons for finding him unsuitable:

> You . . . would pose an unreasonable risk of danger to society or a threat to public safety it released from prison at this time.

> . . . the gravity of the offense [which] was carried out in an especially cruel and callous manner. It involved multiple victims . . . The offense was carried out in a dispassionate and calculated manner . . . which demonstrates an exceptionally callous disregard for human suffering. The motive for the crime was very trivial in relationship to the offense . . .

> . . . You had incurred a very, very lengthy, lengthy criminal history dating back to the age of 13. (Exhibit A, pp. 83-84.)

Accordingly, the panel found petitioner unsuitable for parole for the third time since he became eligible to parole *eight years* earlier, based solely on its recitation of codified factors of his commitment offense and his prior criminal record.

In an allegedly "separate" decision, the panel deferred petitioner's subsequent hearing for three years (two years more than the standard one-year denial) based on the fact that "you have been convicted of murder first," and a re-recitation of most of the same grounds it recited moments before for its unsuitability finding. (Exhibit A, p. 86.)

## REQUIREMENTS OF DUE PROCESS; STANDARD OF REVIEW

1. California parole law provides inmates a liberty interest in parole protected by due process. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 621 [*Rosenkrantz*]; *McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895, 901-903 [*McQuillion*].)

PETITION FOR REVIEW; In re ALEX JACKSON – Page 7

2. Petitioner's protected liberty interest required his being granted parole because he has been eligible to parole since *1998* and has been evaluated to pose no risk to public safety whatsoever ("***no more than that of the average citizen in the community***"), far below the State's "unreasonable risk of danger" parole suitability determinant. (15 CCR §§ 2401, 2402(a).)

3. Due process required the findings supporting petitioner's parole decision to be based on a weighing of all relevant, reliable evidence in the record (*In re Minnis* (1972) 7 Cal. 3d 639, 646; *In re Ramirez* (2001) 94 Cal.App.4[th] 549, 569-572; see *Rosenkrantz*, 29 Cal.4[th] at p. 655; 15 CCR § 2402(b)), using the *preponderance of the evidence* standard.[4]

4. Parole denial based solely on some evidence of an egregious commitment offense may violate due process if the panel did not duly consider and weigh in its decision *all* of the evidence in the record favoring parole suitability. (*In re Scott* (2005) 133 Cal.App.4[th] 573, 594 et seq.; see 15 CCR § 2402(b); *In re Minnis, supra*, 7 Cal. 3d at 646; *In re Capistran* (2003) 107 Cal.App.4[th] 1299, 1306.)

5. Although a prisoner like petitioner who qualifies for parole may initially be found unsuitable if the commitment offense was particularly egregious compared to other instances of the offense, such cases are *exceptions*, and commitment offenses cannot justify *repeated* or *interminable* parole denials. (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916 [*Biggs*]; *Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp. 2d 1038, 1046-1047 amended at 448 F.Supp.2d 1143; *Sanchez v. Kane* (C.D. Cal.

---

[4] Decisions determining parole must be based on "good cause." (*In re Powell* (1988) 45 Cal.3d at p. 901; *In re Brown* (1967) 67 Cal.2d 339, 342; *In re McClain* (1960) 55 Cal.2d 78, 87; ~~*In re Caswell* (2001) 92 Cal.App.4~~[th] ~~1017, 1024, 1026; *In re Gluchette* (1974) 39~~ Cal.App.3d 561, 565; *In re Monzo* (1973) 33 Cal.App.3d 144, 147.) The Board's regulations define good cause as "a preponderance of the evidence." (15 CCR § 2000(b)(50).)

2006) 444 F.Supp.2d 1049, 1062; *In re Scott* (2005) 133 Cal.App.4[th] 573, 595; see *Rosenkrantz v. Marshall* (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1080-1087.)

6. If the Board uses offense facts and other unchangeable factors to justify a finding of parole unsuitability, it must articulate some *nexus* to the State's codified standard by explaining *how such factors make the prospective parolee a **current** "unreasonable risk of danger" to public safety* if paroled; otherwise such offense factors do not amount to "some evidence" that granting parole would create an "unreasonable risk of danger" to public safety. See 15 CCR §§ 2401, 2402(a); please see authorities set forth on pp. 15-16 below.

7. Preclusion of parole based on the facts of a murder offense may constitute a due process violation after a prospective parolee committed for that offense has served in excess of the prison term imposed or prescribed by the Board's regulations for an offense with those facts. See *Rosenkrantz*, 29 Cal.4[th] at 689; *Irons v. Carey* (9th Cir. 2007) 479 F.3d 658, 665.

## PETITIONER'S CONSTITUTIONAL CLAIMS

### I. Because No Evidence Supported the Panel's Finding that Petitioner's Parole Poses an "Unreasonable Risk of Danger" to Society or a Threat to Public Safety, " Denial of Parole on that Basis Violated Due Process

The sole ground stated by the panel for finding petitioner unsuitable was its recitation of the codified criterion, stating that he poses "an unreasonable risk of danger to society or a threat to public safety if released from prison at this time." (Exhibit A, p. 83.) The panel's recitation of the code verbatim including the disjunctive, "or," not indicating which of the two clauses (or both) applied, reflects the boilerplate nature of the decision.

The two findings set forth by the panel in support of that conclusion are detailed in the following section.

Parole denial based on the "unreasonable risk" ground denied due process; it was supported by no evidence whatsoever. *All* reliable evidence before the panel that addressed petitioner's current and future dangerousness and parole risk assessed these factors to be low. No evidence assessed it to be anywhere near the panel's "unreasonable risk of danger" finding.

The only reliable evidence assessing petitioner's current dangerousness and parole risk was petitioner's forensic evaluation, in which Dr. Reed concluded that, "[i]f released to the community, his violence potential is considered to be no more than that of the average citizen in the community." (Exhibit C, p. 6.) Petitioner's correctional evaluation likewise determined his parole risk to be low. (Exhibit D, p. 6.)

Because petitioner's record consistently establishes his low parole risk and *no* evidence addressing that factor supported the panel's finding of "unreasonable" risk, finding petitioner to be unsuitable for, and denying parole on that basis abrogated due process.

## II. Because the Two Findings Stated by the Panel for its Unreasonable Risk Ground Were Supported by No Evidence, Inapposite to the Record, and/or Irrelevant to Parole Determination, Parole Denial on that Basis Violated Due Process

### 1. Prior Criminal Convictions

The panel stated as its second finding:

. . . You had incurred a very, very lengthy, lengthy criminal history dating back to the age of 13. (Exhibit A, p. 84.)

The unsuitability factor utilized by the panel is defined:

> "Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim . . ."  (15 CCR § 2402(c)(2).)

Petitioner suffered several juvenile and adult convictions, only two of which could be considered "violent," an armed robbery as an adult, and an attempted rape when he was 17 years old involving a female 3½ years younger than he.  See exhibit D, pp. 3-4.

Although petitioner's criminal record prior to the commitment offense was extensive, it did not fit the codified criterion for unsuitability because it was largely non-violent, nor did the panel cite any evidence establishing a nexus to his current parole risk.  Considering the forensic evaluator's conclusion that petitioner has fully reformed from his earlier misconduct and poses no risk for violence beyond that of "the average citizen," the omissions were crucial and abrogated due process.

## 2. The Commitment Offense

The panel's remaining finding in support of its "unreasonable risk" ground was its recitation of codified factors depicting the commitment offense of first degree murder, specifically:

> . . . [the offense] was carried out in an especially cruel and callous manner.

> It involved multiple victims . . .

> . . . [the offense] was carried out in a dispassionate and calculated manner . . .

> . . . which demonstrates an exceptionally callous disregard for human suffering.

PETITION FOR REVIEW; In re ALEX JACKSON – Page 11

The motive for the crime was very trivial in relationship to
the offense . . . (Exhibit A, p. 83.)

The panel thus recited verbatim all five of the codified factors listed
under 15 CCR § 2402(c) for first degree murders that are "especially
heinous, atrocious, or cruel." Because petitioner's life offense, a fairly
typical first degree murder, whether considered in the abstract or compared
to other first degree murders, and particularly his role in it, neither planning
nor condoning a murder nor being the shooter, was certainly not "especially
heinous, atrocious, or cruel," the factors recited by the panel as examples of
such a crime, were inapplicable.

The panel cited no evidence whatsoever that petitioner's actions were
"especially cruel and callous" for a first degree murder, that the offense was
"dispassionate and calculated" (it was conceded that the intent was not to
kill, but to rob the victim), or that petitioner displayed "exceptionally callous
disregard for human suffering," The witnesses and trial court acknowledged
that petitioner advised Gray there was to be "no shooting," and that only
Gray harbored an intent to kill and fired the shots. See exhibit F, p. 4;
exhibit G, p. 4; exhibit H, p. 2.

Our courts have repeatedly chastised BPH for its panels' repetitious,
baseless recitation of these offense factors to support every finding of parole
unsuitability. In *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, rev. den., the
court found that no evidence supported the panel's finding that Rosenkrantz
displayed "an exceptionally callous disregard for human suffering." (*Id.*, p.
425); see *In re Smith* (2003) 114 Cal.App.4th 343, 367 [no evidence that
Smith acted with the requisite "cold, calculated dispassion"].)

In *In re Scott* (2004) 119 Cal.App.4th 871, 891, the court noted that
"all murders involve some callousness, i.e., lack of emotion or sympathy,
emotional insensitivity, indifference to the feeling and suffering of others";

PETITION FOR REVIEW; In re ALEX JACKSON – Page 12

to demonstrate an "exceptionally callous disregard for human suffering" the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of murder.

The codified "exceptionally callous disregard for human suffering" factor applies by definition to murders akin to "execution-style killing(s)" (15 CCR § 2402(c)(1)(B), a category inapplicable to petitioner's offense.

The "very trivial" motive sub-factor recited by the panel was inapplicable because (1) any motive is trivial for a first degree murder, and (2) the established motive for the offense, to steal drugs and money, although it can never justify or excuse such an offense, was not at all "very trivial."   As the Court of Appeal recently explained:

> . . . . The offense committed by most prisoners serving life terms is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed "trivial." The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must "normally" be given release dates when they approach their minimum eligible parole dates. (Pen.Code § 3041, subd. (a).) The governing statute also states that the Board shall set a release date
>
> "unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen.Code § 3041, subd. (b).) This language means a "more lengthy period of incarceration" is called for where the gravity of the offense or offenses of the prisoner in question is more indicative of a danger to the public if the prisoner is released than would ordinarily be the case.

(*In re Scott* (2004) 119 Cal.App.4[th] 871, 892-894.)

Finally, while petitioner concedes that the offense had multiple victims, a fact he can never change, his personal role in the offenses was minimal: he allegedly kicked one of the victims but did not commit, attempt to commit, or contemplate murder or physical injury.

Because the panel failed to consider or mention petitioner's role in the offense (case law for offender as well as crime) and, more importantly, because the first degree murder was not in the oft-used "heinous, atrocious, and cruel" category for that offense needed to qualify for the sub-factors recited, the panel's use of the criteria to deny parole abrogated due process and petitioner's protected liberty interest in parole.

### III. The Decision Based on Unchangeable Offense and Prior Record Facts Violated Due Process Because the Panel Established no Nexus to Petitioner's Current Parole Risk to Public Safety, a Crucial Omission Considering that Petitioner had Served in Excess of the Maximum Prison Term Prescribed by the Regulations for a First Degree Murder with those Facts and Has Been Evaluated by the Board's Forensic Experts to Pose No Risk Whatsoever to Public Safety if Paroled

The statute requires that parole "shall normally" be granted (Pen.C §  3041(a)), *unless* "the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that a consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Subd. (b).) The statute and a prospective parolee's protected liberty interest in parole thus require more than what the BPH panel did – recite commitment offense and prior history facts to *presume* a current parole risk to public safety. The "some evidence" test

PETITION FOR REVIEW; In re ALEX JACKSON – Page 14

requires a reviewing court to find that the panel articulated a *nexus* between those facts and the State's parole suitability determinant – the risk to public safety currently posed by petitioner's parole.

The unambiguous language of the statute, that parole "shall normally" be granted "unless" either the "timing" or "gravity" of the commitment offenses *translates to* a current public safety risk, clearly required at least a minimal *nexus* between the offense facts alleged and petitioner's *current* parole risk. Such a nexus may be established, e.g., if an offense was caused by or related to alcohol, drugs, gangs, or other factors that the inmate's prison record or forensic evaluations indicate may still be a public safety concern. A recitation of codified verbiage about the commitment offense to imply that public safety *therefore* requires petitioner's continued imprisonment (forever – the offense can never change) is not a decision based on some or any evidence, but on a mere *presumption*.

A plethora of recent California state and district court decisions have stressed the requirement of such a nexus. See, e.g., *In re Scott* (2005) 133 Cal.App. 4th 573, 595 ["the commitment offense can negate suitability only if circumstances of the crime . . . rationally indicate that the offender will present an unreasonable public safety risk if released from prison"]; *In re Elkins* (2006) 144 Cal.App.4th 475, 496, 499 ["Thus, a governor, in reviewing a suitability determination, must remain focused not on circumstances that may be aggravating in the abstract but, rather, on facts indicating that release currently poses 'an unreasonable risk of danger to society'"]; *In re Lee* (2006) 143 Cal.App.4th 1400, 1413 [". . . the board and Governor must focus their parole decisions on whether a prisoner continues to pose an unreasonable risk to public safety . . ."]; *In re Lawrence* (2007) 150 Cal.App.4th 1511; *In re Gray* (2007) 151 Cal.App.4th 379; *In re Barker* (2007) 151 Cal.App.4th 346; see *Willis v. Kane* (N.D. Cal. 2007) 485

F.Supp.2d 1126, 1135 ["Notwithstanding the terrible nature of the crime, the critical question the BPH was supposed to decide at the parole suitability hearing was whether 'consideration of the public safety requires a more lengthy period of incarceration for this individual' . . . Willis' 1983 crime did not did not provide sufficient evidence to find him unsuitable for parole in 2003"]; *Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1049; *Blankenship v. Kane* (N.D. Cal. 2007) __ F.Supp.2d __, 2007 WL 1113798 at *10 [". . . the California regulations require . . . some evidence that the prisoner poses a present danger to society . . . continued reliance over time on an unchanging factor . . . the commitment offense . . . does not provide evidence of a present danger to society"]; *Thomas v. Brown* (N.D. Cal. 2006) __ F.Supp.2d __, 2006 WL 3783555 at *6 [not some evidence that the murder shows current parole unsuitability]; *Rosenkrantz v. Marshall* (C.D. Cal. 2006) 444 F.Supp. 2d 1063, 1086 ["the facts surrounding Petitioner's crime no longer amount to 'some evidence' supporting the conclusion that Petitioner would pose an unreasonable risk of danger if released on parole"].

As those recent state and federal decisions have verified, due process and the parole scheme (Pen.C § 3041; 15 CCR §§ 2401-2402(a)) require articulation of a nexus between the offense facts recited and a petitioner's current parole risk. If parole does not pose a current "unreasonable risk of danger" to public safety, parole *must* be granted. *Id.*

Accordingly, the Court, in applying the some evidence standard in reviewing a decision by BPH should initially ask – "Some evidence of WHAT"? The state and federal cases cited above require a finding – *not* of some evidence of egregious facts of commitment offenses – but some relevant reliable evidence that those facts – or any other factors recited by a

BPH panel or Governor – *make the prospective parolee a current "unreasonable risk of danger" to public safety* (all murderers were public safety risks at the time of their offenses), the suitability determinant. *Id.*

Stated differently, the some evidence standard can be satisfied only if the Court finds some relevant, reliable evidence in the record before the panel – the commitment offense facts or any other factors used to deny parole – demonstrating that petitioner *continues to pose an unreasonable risk of danger to public safety*. Petitioner respectfully suggests that the Court will find that no such evidence exists. Accordingly, because the panel was unable to suggest that the commitment offense and prior record facts it dutifully recited had any bearing on petitioner's current parole risk to public safety, the panel's decision flunks the some evidence standard of review.

## IV. Interminable Preclusion of Parole Based on Petitioner's Conviction of Murder and Prior Record Denies Due Process; Because Neither Those Facts nor Petitioner's Negligible Parole Risk to Public Safety can Further Improve, and Because he has Served in Excess of the Maximum Prison Term Prescribed by the Regulations for a First Degree Murder with Those Facts, Denial of Parole on that Basis is Necessarily Interminable and has Impermissibly Converted his Prison Term to Life With No possibility of Parole

The authorities cited at pp. 7-10 that permit parole denial to an otherwise qualified prisoner whose commitment offense conduct was particularly egregious when compared with others who commit the offense, place reasonable limits on such discretion to preclude repeated or interminable denial of parole on that basis. Because the facts and circumstances of commitment offenses can never change, a contrary policy would convert sentences like petitioner's 25-years-to-life with the possibility

PETITION FOR REVIEW; In re ALEX JACKSON – Page 17

of parole, to life without the possibility of parole. As this Court has explained:

> [T]he Legislature has clearly expressed its intent that when murderers—who are the great majority of indeterminate sentences—approach their minimum eligible parole date, the Board "shall normally set a parole release date." (Pen.C. § 3041, subd. (a).) The Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted . . . (*Rosenkrantz*, 29 Cal.4th at p. 683, citing *In re Ramirez* (2000) 94 Cal.App.4th 549, 570.)

The Ninth Circuit reviewed the constitutional propriety of a BPH panel's use of a first degree murder commitment offense to find a prisoner unsuitable for parole at his <u>first</u> hearing. The Court found no evidence to support most of the panel's grounds for unsuitability, but held that a particularly egregious commitment offense could be an appropriate basis for finding such a prisoner unsuitable for parole at an *initial* parole hearing. The Ninth Circuit cautioned:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole...

> A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to

imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

(*Biggs, supra*, 334 F.3d at 916-917.)

*Biggs*' holding has been relied on in addressing the issue here raised by petitioner, in decisions by the State's courts and by the United States District Courts in California and the Ninth Circuit Court of Appeals.

*Irons v. Carey* (9th Cir. 2007) 479 F.3d 658 is the Ninth Circuit's third in a trilogy that includes *Biggs,* and *Sass v. California Board of Prison Terms* (9th Cir. 2006) 461 F.3d 1123 ("*Sass*"). In *Biggs, Sass, and Irons,* the Ninth Circuit adjudicated one of petitioner's pivotal claims: whether, consistent with due process, the unchanging facts of commitment offenses may be employed repeatedly or interminably to preclude the parole of one like petitioner who indisputably satisfies all parole requirements who is forensically evaluated to pose a low parole risk, and who has served in excess of the appropriate or maximum prison term prescribed by the regulations for an offense with those facts.

In *Irons* the Ninth Circuit held that the BPH panel's use of Irons' crime, a particularly egregious murder, *before he had served the minimum prison term imposed by the trial court*, satisfied the "some evidence" test sufficiently to uphold the BPH panel's decision finding that Irons was unsuitable for parole. The court first focused on Irons' egregious murder; he fired 12 rounds into the victim, then, when he found the victim was still alive, stabbed him twice. After leaving the corpse in a sleeping bag for 10 days, Irons removed and weighted it, and dropped it in the ocean.

The Ninth Circuit then emphasized that Irons, like Sass and Biggs before him, had not served his minimum term, i.e., "the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board." In discussing *Biggs, Sass,* and *Irons,* the Court

PETITION FOR REVIEW; In re ALEX JACKSON – Page 19

carefully noted that while each decision must rest on its own facts, neither Biggs, Sass, nor Irons had served their aforementioned "minimum" terms when the Board denied parole.

In *Irons* the Court explained why *Biggs* is still good law and was <u>not</u> overturned by *Sass*, and re-emphasized that *continued use of commitment offense facts to find such an inmate unsuitable for parole may constitute a due process violation <u>after the minimum term has been served</u>*:

> In *Biggs*, we affirmed the district court's denial of a prisoner's petition for habeas corpus challenging the Board's determination that he was unsuitable for parole on the basis of his commitment offense. [ ] Although we held that the Board's decision was supported by "some evidence" because "[t]he murder of which Biggs was convicted involved killing a witness in a manner which exhibited callous disregard for life," we made clear that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.
>
> . . . Specifically, we held that a parole board's sole ... reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole. []
>
> Subsequently, in *Sass,* we held that denying parole to an individual in reliance on his offense of commitment did not violate due process. [] Although we acknowledged that *Biggs* represents the law of this circuit and specifically noted that "continued reliance ... [on] the offense and on conduct prior to ~~imprisonment ... could result in a due process violation," "*id.,*~~ we nonetheless held that the Board's reliance on the "gravity" of the second degree murder of which Sass was convicted, in combination with prior incidents of unlawful conduct, provided

PETITION FOR REVIEW; In re ALEX JACKSON – Page 20

a sufficient basis for the Board to deem Sass unsuitable for parole.

Because the murder Sass committed was less callous and cruel than the one committed by Irons, and because Sass was likewise denied parole in spite of exemplary conduct in prison and evidence of rehabilitation, our decision in *Sass* precludes us from accepting Iron's due process argument or otherwise affirming the district court's grant of relief. *We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in Biggs, Sass, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board.* [] All we held in those cases and all we hold today, therefore, is that, *given the particular circumstances of the offenses in these cases,* due process was not violated when these prisoners were deemed unsuitable for parole *prior to the expiration of their minimum terms.*

Furthermore, we note that in *Sass* and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole. *We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.* Biggs, 334 F.3d at 917.

(*Irons v. Carey, supra,* at pp. 664-665, emphasis added).

Applying the standard set forth in *Irons*, petitioner has now served approximately six years in excess of his minimum 25-year prison term

PETITION FOR REVIEW; In re ALEX JACKSON – Page 21

(including more than six years of pre-sentence term credit and good conduct term credit to which he is entitled (15 CCR § 2410).)

In a recent California district court case involving a potential parolee committed for murder, the court reasoned:

> Another critical difference between this case and *Biggs, Sass* and *Irons* is that Brown has served a substantial amount of time beyond his minimum sentence. This court must consider that at some point after an inmate has served his minimum sentence the probative value of his commitment offense as an indicator of "unreasonable risk of danger to society" recedes below the "some evidence" required by due process to support a denial of parole. *See Irons, 479 F.3d at 665*. A decision to revoke parole based solely on an inmate's commitment offense that can no longer be considered probative of dangerousness to society would be arbitrary and not comport with the "some evidence" standard. *See Hill, 472 U.S. at 545-55, 457*. This is one of those cases...
>
> Petitioner's commitment offense would be a sufficient basis to deny his parole if it indicated a risk of re-offending and of a danger to society. It does not... By itself, however, Brown's exercise of poor judgment at age 22 is not probative, absent any more recent indicators, of his exercise of poor judgment again at his nearing the age of 50. Not only did the Governor and state courts fail to point to any such indicators, but Brown's ultimately positive prison record over the past two and a half decades indicates, as the BPT concluded, that he is suitable for parole.
>
> The state court's determination that the Governor's sole reliance on Brown's commitment offense satisfied the "some evidence" standard was an objectively unreasonable application of *Hill*. *See* 28 U.S.C. § 2254(d). Brown is entitled to federal habeas relief on his due process claim.

(*Brown v. Kane* (N.D. Cal. 2007) ___ F.Supp.2d ___, 2007 WL 1288448 at *6-7.)

PETITION FOR REVIEW; In re ALEX JACKSON – Page 22

In *Sanchez v. Kane, supra*, 444 F.Supp.2d 1049, Sanchez had been denied parole based on the gravity of his commitment offense, also a murder. The Court affirmed Sanchez' protected liberty interest in parole. (*Id.* at p. 1058.) After rejecting several evidentiarily unsupported grounds, the court, in ordering Sanchez' release, addressed the claim here at issue — the continued use of a murder commitment offense to repeatedly preclude Sanchez' parole:

> Finally, the Governor relied upon the callous nature and circumstances of the crime, stating "[i]t was a planned calculated and cold-blooded murder demonstrating exceptionally callous disregard for human suffering ··· [and it] involved particularly egregious acts beyond the minimum necessary to sustain a conviction of second-degree murder." [] However, as the Board recognized, the events and circumstances surrounding Petitioner's crime are unchanging. [] ("I want to explain to you that no matter what happens in your lifetime, the crime is never going to change. You understand that···· That's always going to be there, period···· [T]he crime is never going to change····").

> Although the Board or Governor is "initially justified" in relying on the gravity of an inmate's offense in denying him parole, *Rosas,* 428 F.3d at 1232-33; *Biggs,* 334 F.3d at 916, "continued reliance ··· on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitation goals espoused by the prison system and could result in a due process violation." *Biggs,* 334 F.3d at 916-17; *Irons v. Warden of Cal. State Prison-Solano,* 358 F.Supp.2d 936, 947 (E.D.Cal.2005).

> Here, Petitioner had three prior parole suitability hearings, after each of which he continued to demonstrate "exemplary behavior and evidence of rehabilitation[,]" *Biggs,* 334 F.3d at 916, before the Board found him suitable for parole. Yet, Petitioner has consistently maintained "positive institutional behavior" and "significant and proven self-control[,]" [] thus, "the predictive ability of the circumstances of the crime is near zero." *Irons,* 358 F.Supp.2d at 947 n. 2; *see also In re Scott,*

133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905, 920 ("The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time."). Under these circumstances, the Governor's continued reliance on the circumstances surrounding the murder to deny Petitioner parole violates due process of law. *Irons,* 358 F.Supp.2d at 947; *Scott,* 133 Cal.App.4th at 597-601, 34 Cal.Rptr.3d 905; *see also Johnson,* 2006 WL 195159 at *8 ("As recognized by the [Board,] the inhumanity of the murder will never change, it will not minimize in its shockingness over time. A later decision that the murder 'wasn't so bad' will never be made, and if it were, such a decision would be clearly arbitrary.

Therefore, if the Governor's decision to deny parole based on the nature of the offense is permitted to stand, contrary to the parole statutes which logically measure parole eligibility on the reformation of the prisoner after the proscribed period of punishment, parole eligibility is an impossibility, not a possibility. The parole statutes do not vest the Governor [or the BPH] with the power to re-sentence Petitioner.").

. . . if the Governor's decision to deny parole based on the nature of the offense is permitted to stand, contrary to the parole statutes which logically measure parole eligibility on the reformation of the prisoner after the proscribed period of punishment, parole eligibility is an impossibility, not a possibility. The parole statutes do not vest the Governor with the power to re-sentence Petitioner.").

For the reasons stated herein, the Court finds the Governor's reversal of the Board's grant of parole to Petitioner is not supported by "some evidence" in the record, *Hill,* 472 U.S. 455-56, 105 S.Ct. at 2774; *McQuillion,* 306 F.3d at 912; thus, Petitioner was denied due process.

(*Sanchez v. Kane, supra,* 444 F.Supp.2d at 1061-1062.)

PETITION FOR REVIEW; In re ALEX JACKSON – Page 24

In another recent decision, *Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038, the district court re-affirmed the principles of *Biggs* and its progeny in vacating a decision denying parole in a murder case. Unlike petitioner, Martin's parole risk was <u>moderate</u>, and he had committed <u>twenty</u> disciplinary infractions. In ordering the petitioner's release, the court explained that "because Petitioner cannot change the past," repeated denials of parole based on outdated static factors impermissibly converted Martin's prison term to life without the possibility of parole. Please see the court's amended judgment in *Martin v. Marshall*, 448 F.Supp.2d 1143.

In an even more recent decision on this issue a federal district court ordered the release of a California life term prisoner whose commitment offense was one of the most egregious second degree murders on record — the defendant had purchased and practiced with an Uzi, laid in wait, shot the victim ten times, absconded, and threatened further revenge. In reversing the panel's decision at Rosenkrantz' fourth parole hearing and ordering his release from prison, the district court explained:

> In the circumstances of this case, the BPT's continued reliance upon the nature of Petitioner's crime to deny parole [ ] violated due process. First, continued reliance upon the unchanging facts of Petitioner's crime makes a sham of California's parole system and amounts to an arbitrary denial of Petitioner's liberty interest. Petitioner had been denied parole on six occasions prior to the determination he now challenges. Continued reliance upon the unchanging characterization of Petitioner's offense amounts to converting Petitioner's sentence of seventeen years to life to a term of life without the possibility of parole. [ ]
>
> ~~Second, in this case, the circumstances of Petitioner's crime do~~ not amount to some evidence supporting the conclusion that Petitioner poses an unreasonable risk of danger if released. As discussed, "[i]n the parole context, the requirements of due

PETITION FOR REVIEW; In re ALEX JACKSON – Page 25

process are met if some evidence supports the decision."
Significantly, the evidence underlying the decision must be
supported by "some indicia of reliability." *Biggs*, 334 F.3d at
914 (internal quotations omitted)[.]  Otherwise, it does not
constitute "some evidence." [ ]

While relying upon Petitioner's crime as an indicator of his
dangerousness may be reasonable for some period of time, in
this case, continued reliance on such unchanging circumstances
- after nearly two decades of incarceration and half a dozen
parole suitability hearings-violates due process because
Petitioner's commitment offense has become such an unreliable
predictor of his present and future dangerousness that it does
not satisfy the "some evidence" standard. After nearly twenty
years of rehabilitation, the ability to predict a prisoner's future
dangerousness based simply on the circumstances of his or her
crime is nil. *See Johnson v. Finn*, 2006 WL 195159 at p. 8 n. 3
(E.D.Cal.2006) (stating that "the seriousness of the crime had
predictive value for the dangerousness of Petitioner's release for
the first, second, perhaps third suitability hearing. But as the
years go by, this factor loses its predictive value in light of the
growing experience to the contrary (assuming Petitioner's
record in prison is exemplary)."); *Irons*, 358 F.Supp.2d at 947
n. 2.

Petitioner's case is exactly what *Biggs* envisioned when it stated
that repeated refusals to grant a parole release date to an inmate
with an exemplary post-conviction record may violate the
prisoner's due process rights. *Biggs*, 334 F.3d at 919. The
record is replete with evidence of Petitioner's remorse and
rehabilitation, including glowingly positive psychological
reports, extensive self-improvement through educational and
vocational advancements as well as therapy, valued service in
promoting the penological goals of the prison, and nearly two
decades of disciplinary-free incarceration. The evidence of
Petitioner's outstanding performance while incarcerated is
particularly significant. As the Supreme Court has recognized,
"[t]he behavior of an inmate during confinement is critical in
the sense that it reflects the degree to which the inmate is
prepared to adjust to parole release." *Greenholtz*, 442 U.S. at
15. Regardless of whether the BPT ever was entitled to rely
upon the commitment offense to find that this particular

PETITION FOR REVIEW; In re ALEX JACKSON – Page 26

Petitioner posed an unreasonable risk of danger and was unsuitable for parole, under these unusual circumstances, the BPT's continued reliance on the commitment offense violates due process because it resulted in an arbitrary decision and because the facts surrounding the offense do not now constitute "some evidence" with "some indicia of reliability" of Petitioner's dangerousness. *See Hill, 472 U.S. at 455; Biggs, 334 F.3d at 917; Irons, 358 F.Supp.2d at 947[.]*

(*Rosenkrantz v. Marshall, supra,* 444 F.Supp.2d at 1083-1087.)

California courts have ruled identically on the issue in ordering the release of inmates committed for life offenses. See *In re Scott, supra,* at p. 595, and the later decision in *In re Lee, supra* at 1413. More recently in *In re Elkins, supra,* 144 Cal.App.4th 475, the Court of Appeal, in a published decision in a first degree murder case held, in ordering the prisoner's release on parole:

Given the lapse of [many] years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating facts of the crime no longer amount to "some evidence" supporting denial of parole.

[Note: Elkins' sentence was also 25 years-to-life.]

The commitment offense, this court has observed, is an unsuitability factor that is immutable and whose predictive value "may be very questionable after a long period of time [citation]." (*Scott II, supra,* 133 Cal.App.4th at pp. 594-595, fn. omitted.) We have also noted, as has our Supreme Court, strong legal and scientific support that "predictions of future dangerousness are exceedingly unreliable," even where the passage of time is not a factor and the assessment is made by an expert. (*Id.* at p. 595, fn. 9.) Reliance on an immutable factor, without regard to or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative goals espoused by the prison system, and result in a due process violation. (*Id.* at p. 595.)

PETITION FOR REVIEW; In re ALEX JACKSON – Page 27

[Court reviews authorities, mostly those herein, and orders Elkins' release on parole forthwith.]

(*In re Elkins, supra*, 144 Cal.App.4[th] 475, 499.)

In another murder case, a district court just recently concluded:

[T]he California regulations require the Board to find some evidence that the prisoner poses a present danger to society. A continued reliance over time on an unchanging factor, such as the commitment offense and past substance abuse, does not provide evidence of a present danger to society and thus may rise to the level of a due process violation. Reliance on unchanging factors *transforms an offense for which California law-and the sentencing judge-provided parole eligibility into an offense carrying life imprisonment without the possibility of parole.*

(*Blankenship v. Kane, supra,* at *10; emphasis added.)

Petitioner, a 50-year-old, fully reformed, rehabilitated, parole-qualified citizen, having achieved the maximum parole suitability possible under BPH's regulations and the suitability factors listed therein, was eligible to parole *8½ years ago* on his MEPD of December 19, *1998.* The *maximum* prison term prescribed for the facts of his offense has long lapsed. See p. 6, fn. 2. Yet, BPH continues to preclude his parole based on those facts, which, like his parole suitability otherwise, cannot further improve, modifying his legislatively-prescribed prison term, 25 years-to-life with the possibility of parole, which Pen.C. § 3041(a) defines as a *probability of parole* (panel "shall normally set a parole release date"), to life with *no* possibility of parole. That result is particularly egregious because petitioner did not kill, attempt to kill, or intend to kill, and he has been evaluated by

BPH's forensic staff to pose a risk to public safety commensurate with that of "the average citizen."

Absent judicial intervention, petitioner's parole will *always* be precluded because he cannot change the factors on which its denial is based – unless, as the district court reasoned in *Irons*, some future panel arbitrarily decides that the previous panels were wrong or the factors do not apply. (358 F.Supp.2d at pp. 946-947.) Basing petitioner's possibility of parole on such a whim is a result prohibited by the above-cited authorities, the State's parole laws, and the Due Process Clauses.

## V. The Executive Branch's Anti-Parole Policy Including its Constitution of BPH in Violation of Mandatory Law Violates Due Process

### A. The Anti-Parole Policy is Arbitrary and Contrary to Law

The anti-parole policy was initiated by former Governor Pete Wilson who, toward the end of his second term in the late 1990's, following an incident in which Willie Horton, a convicted murderer in Massachusetts, committed a rape while on furlough that impacted the presidential campaign of Senator Dukakis.  Using Pen.C. § 3041.1, Governor Wilson referred all cases of indeterminately sentenced prisoners (lifers), who had been granted parole but not yet paroled, to BPH, which rescinded nearly all of the paroles by deeming them to have been "improvidently" granted.  Most of those inmates are still imprisoned or have died.

On April 9, 1999, Governor Davis proclaimed he would exercise his authority under Pen.C. § 3041.2 to preclude the parole of all inmates who had been convicted of murder; there would be "no exceptions – none."

Pursuant to that policy, only six paroles granted to such prisoners (in over 8,000 hearings) were allowed to parole over the ensuing five-year period.[5]

After Davis was deposed by the voters, Governor Schwarzenegger's staff (the Governor is not involved in the process except to sign or authorize a staff member to sign the decisions) has continued the policy to a slightly lesser extent, reversing approximately 72% of the very few paroles granted by BPH in murder cases.[6]

According to statistics issued by BPH on March 8, 2006, in 2005 BPH conducted hearings for 2,788 inmates whose commitment offense was murder, of which 152 (5.5%) were "granted" parole. Most of those "grants" were disapproved by BPH review staff or reversed by the Governor, allowing only thirty-one to parole.

Thus, only 1.1% of parole hearings for prisoners serving indeterminate sentences for murder results in an actual parole – compared to the parole statute's mandatory requirement that parole should "normally" be granted to such inmates at their initial hearings. (Pen.C. § 3041(a).)

Petitioner respectfully refers the Court to exhibit E, a decision in *Coleman v. Board of Prison Terms, et al.* (E.D. Cal. 2005), case No. 96-0783, including evidence re-affirming existence of California's anti-parole policy.

---

[5] Petitioner will submit, on the Court's request, these statistics obtained from the Governors' office, BPH, and other sources.

[6] This figure has increased recently to 90 percent, although current formal figures are not available.

### B. <u>The Parole Determination Process Violates Due Process; It is</u> <u>Inherently Biased Against Parole Because BPH and its Panels'</u> <u>Constituency is Contrary to Statute</u>

Penal Code § 5075 requires in pertinent part:

> "The selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross-section of the racial, sexual, economic, and geographic features of the population of the state."

Of the last thirty-four new commissioners appointed by governors, thirty-one were former law enforcement personnel (who helped to incarcerate the individuals they now judge by arresting and testifying against them), anti-parole Legislators (who passed laws to keep such inmates imprisoned longer), and/or crime victim advocates (whose sole proclaimed goal is to prevent all such paroles). The appointment of such biased commissioners is contrary to the statute's requirements. At the time of petitioner's hearing, all commissioners (except those "inherited" from the Youth Authority and Narcotics Boards when they merged with BPH) were in those categories. BPH has no commissioners from the State's lower or lower-middle economic strata or from the State's largest industries (farming, labor); only one commissioner is from the State's smallest thirty counties. Importantly, BPH, unlike other States' parole boards, has no members with training or qualification to determine parole. There are no former judges, public defenders, non-government lawyers, psychologists, psychiatrists, educators, or clergy. All are strictly political appointees to promote the governors' publicly proclaimed anti-parole mandate.

It would be practically impossible to constitute a parole board not inherently biased against petitioner and his parole. BPH's constituency violates the intent and the mandatory ("shall") language of Pen.C. § 5075, insures bias and fundamental unfairness, and violates the liberty interest and right to due process vested in petitioner by the State's parole laws protected by the Due Process Clauses of the Federal and State Constitutions.

### RELIEF REQUESTED

Petitioner ultimately seeks a habeas corpus order directing BPH to vacate its decision of December 14, 2005, to conduct a hearing for the sole purpose of determining his prison term and a parole date in accordance with its regulations, and, if the date set has lapsed, to discharge him from prison to serve the remainder of his prescribed parole term, if any, after its reduction by the time of his imprisonment in excess of the term so set and any statutory or regulatory term credit to which petitioner is entitled by law.

On the grounds set forth at page 2, and the claims, authorities, argument, and exhibits filed in the court below, petitioner respectfully asks the Court to review the decision of the Court of Appeal denying habeas corpus relief.

Date: _7-4-'07_

Respectfully submitted,

Michael J. Gunning
Counsel for Petitioner
Alex Jackson

## CERTIFICATION OF WORD COUNT

I certify that the word count of this document, excluding the tables of contents and authorities and the Court of Appeal Opinion, according to the Microsoft Word program is 9,716.

Date: 7-4-'07

Declarant